ANWAY v. GRAND RAPIDS RAILWAY CO.

STATUTES—CONSTITUTIONAL LAW—BILL OF RIGHTS.

Act No. 150, Pub. Acts 1919, entitled "An act to authorize courts of record to make binding declaration of rights," is unconstitutional in that it attempts to confer upon the courts power not judicial, and requires performance of acts nonjudicial in character. CLARK and SHARPE, JJ., dissenting.

Appeal from Kent; Perkins (Willis B.), J. Submitted April 20, 1920. (Docket No. 93.) Decided September 30, 1920.

Bill by Charles Anway against the Grand Rapids Railway Company, under Act No. 150, Pub. Acts 1919, to obtain a declaration of rights involved in Act No. 361, Pub. Acts 1919. Division 836, Amalgamated Association of Street and Electric Railway Employees of America, intervened as a party defendant. From a decree for plaintiff, defendants appeal. Reversed, and bill dismissed.

*Charles E. Ward,* for plaintiff.

*Knappen, Uhl & Bryant,* for defendant railway.

*Ellis & Ellis,* for defendant intervener.

*Alex. J. Groesbeck,* Attorney General, *Sheridan F. Master,* Assistant Attorney General, *Edson R. Sunderland* and *W. W. Potter, amici curiæ.*

FELLOWS, J. This is a proceeding instituted in the circuit court for the county of Kent in chancery, under Act No. 150 of the Public Acts of 1919, entitled: "An act to authorize courts of record to make binding declaration of rights." The act will be found in the

margin. Briefly stated, the bill alleges that plaintiff is employed by defendant street railway company as a conductor; that he desires to work more than six days in consecutive seven days; he does not claim to have any such contract with defendant; he claims no breach of any contract; he does not allege that defendant has committed, or threatened to commit, any wrong upon him, or that he has any claim, present or prospective, for any damages from defendant. He seeks to have this court advise him whether the defendant will violate the provisions of Act No. 361, Pub. Acts 1919, *if* it should in the future permit him to work more than six days in consecutive seven days. Stated in the language of plaintiff's brief:

"The sole question in the case is as to the meaning of Act No. 361 of the Public Acts of 1919. The precise question is, Does that act make it unlawful for a street railway company to allow its motormen or conductors or both to work more than six days in any consecutive seven days of twenty-four hours each if the conductors or motormen so desire?"

The defendant railway company answers, admitting the allegations of the bill. Division 836, Amalgamated Association of Street and Electric Railway Employees of America, intervenes. It is not claimed that the rights of any of these parties have been invaded,

"AN act to authorize courts of record to make binding declaration of rights.

"*The People of the State of Michigan enact:*

"Section 1. No action or proceeding in any court of record shall be open to objection on the ground that a merely declaratory judgment, decree or order is sought thereby, and the court may make binding declarations of rights whether any consequential relief is or could be claimed, or not, including the determination, at the instance of any one claiming to be interested under a deed, will or other written instrument, of any question of construction arising under the instrument and a declaration of the rights of the parties interested.

211—Mich.—38.

nor is there threat of invasion of the rights of any one. No damages are claimed, nor is there threat of any damage. The proceeding must rest, and rest alone, upon Act No. 150. The learned author of this act says of it (54 American Law Review, p. 161):

"Now for the first time American legislation has definitely committed itself to the principle that an adequate system of remedial law requires courts to offer remedies in advance of the happening or even of the threat of any wrongful act and to authoritatively advise parties as to what their legal rights may be in the circumstances in which they find themselves."

And calling attention to the character of matters to which the act is applicable, he considers eight subdivisions, the first one of which we quote (page 177):

"A declaration of rights may be had where there is a present possibility of immediately creating a cause of action, as by a demand or refusal, but the parties have not done so, perhaps through reluctance to precipitate a conflict. This is the typical case for a friendly application to the court."

And the author of this measure in his brief considers the present case a typical one for the application of the act.

Considering the act itself as well as the very able paper by its author in volume 54 American Law Review, p. 161, under the title "The Courts as Author-

"SEC. 2. Declarations of rights and determinations of questions of construction, as herein provided for, may be obtained by means of ordinary proceedings at law or in equity, or by means of a petition on either the law or equity side of the court as the nature of the case may require, and where a declaration of rights is the only relief asked, the case may be noticed for early hearing as in the case of a motion.

"SEC. 3. Where further relief based upon a declaration of rights shall become necessary or proper after such declaration has been made, application may be made by petition to any court having jurisdiction to grant such relief, for an order directed to any party or parties whose rights have been deter-

ized Legal Advisers of the People," it at once becomes apparent that by the act the courts of this State are made the legal advisers of all seeking such advice, not through their existing opinions in matters which have involved wrongs committed and redressed by such tribunals, but in advance of any infringement of their rights, any breaches of their contracts; and that in advance of any existing controversy that they be advised by a declaration of rights as to what the law is, or will be, in the event of future breaches, future contingencies which may or may not happen. Indeed, this is the essence of the measure. Before this court, with its membership of eight, takes up the work of advising three million people and before the legislature is called upon to increase the membership of this court so as to efficiently conduct this work, it is well that this court pause long enough to consider, and consider fully, whether the act calls upon us to perform any duties prescribed by the Constitution or to exercise any power therein conferred. At the argument counsel engaged in the case were asked to file briefs upon the constitutionality of the act, the attorney general was requested to file a brief *amicus curiae,* and the author of the bill was invited to do likewise. All have complied and others interested in the measure have favored us with briefs upon the question. All authorities that have been called to our attention in the briefs

mined by such declaration, to show cause why such further relief should not be granted forthwith, upon such reasonable notice as shall be prescribed by the court in the said order.

"SEC. 4. When a declaration of rights, or the granting of further relief based thereon, shall involve the determination of issues of fact triable by a jury, such issues may be submitted to a jury in the form of interrogatories, with such instructions by the court as may be proper, whether a general verdict be rendered or required or not, and such interrogatories and answers shall constitute a part of the record of the case.

"SEC. 5. Unless the parties shall agree by stipulation as to the allowance thereof; costs in proceedings authorized by this act

have been read, together with a large number of others which our independent research has brought to light. It is manifest that all cases examined cannot be discussed within the compass of this opinion, but the eminence of the author of the act, the fact that it was advocated by the legislative committee of the State Bar Association, the zeal of its advocates, prompts us at the expense of prolixity to quote from and cite many of the cases which have been considered.

We do not consider the question of whether the act deprives parties of their constitutional right of trial by jury, nor the question whether the act offends the "due process" clause of the Federal Constitution. We do not regard a determination of these questions necessary to the decision of the validity of the act. Authorities upon these questions have been examined to ascertain whether they throw light on the question under consideration. We have examined the decisions of many State courts of last resort, but as would be expected, have found more aid in reaching our conclusion from the decisions of the Federal court of last resort than from any one other source. And in view of the fact that one of the briefs cites and quotes from a paper prepared by one of the professors of one of the country's great universities no less than fourteen times we regard it as proper to remark that we are compelled to accept the final decisions of the United States Supreme Court and the decisions of this or other State

shall be allowed in accordance with such special rules as the Supreme Court may make, and in the absence of such rules the practice followed in ordinary cases at law or in equity shall be followed wherever applicable, and when not applicable, the costs or such part thereof as to the court may seem just, in view of the particular circumstances of the case, may be awarded to either party.

"SEC. 6. This act is declared to be remedial, and is to be liberally construed and liberally administered with a view of making the courts more serviceable to the people.

"Approved May 2, 1919."

courts of last resort as to what the law is rather than the views of able writers of papers as to what it ought to be. We note that the learned professor, who is so frequently quoted, entertains the view that it is the duty of the State through its courts to furnish advice to its citizens rather than to leave them to "unauthoritative advice of counsel." This adopts the view that "the State is everything, the individual nothing." Under our government the State does not till our farms, manufacture our automobiles, conduct our great department stores or do our law business for us. The unfortunate people of one country are at present trying such experiment in government. We are still a government of laws, operating under a written Constitution, and to it rather than to the question of desirability we must look for our power. If such power as we are here asked to exercise under this act is wanting in the Constitution then this court lacks such power and the legislature lacks authority to grant it.

Many cases will be found where courts have solved the problems submitted to them without question as to their power; indeed, that is what we are asked to do in this case, and one of the counsel most strenuously insists that in view of the fact that none of the parties of record raises the question of the constitutionality of the act this court ought not to. But it must be borne in mind that the question of the jurisdiction of this court is here involved, and every requirement of public policy impels an early determination of the validity of the act. But if we had acceded to counsel's request and, without regard to the validity of the act, had prepared an opinion determining and answering the questions propounded, could it have been successfully contended when the question of power was raised that our determination of this controversy was authority on the question of power? We think not. And so when the question of power is involved we must look for light

to those cases which have discussed it rather than to those cases which have decided the questions submitted without regard to the question of power.

This State in common with the other States of the Union patterned after the Federal Constitution in providing for the division of powers. It is provided in our Constitution:

"ARTICLE IV.

"SECTION 1. The powers of government are divided into three departments: The legislative, executive and judicial.

"SEC. 2. No person belonging to one department shall exercise the powers properly belonging to another, except in the cases expressly provided in this Constitution."

"ARTICLE VII.

"SECTION 1. The judicial power shall be vested in one Supreme Court, circuit courts, probate courts, justices of the peace and such other courts of civil and criminal jurisdiction, inferior to the Supreme Court, as the legislature may establish by general law, by a two-thirds vote of the members elected to each house."

"SEC. 4. The Supreme Court shall have a general superintending control over all inferior courts; and shall have power to issue writs of error, habeas corpus, mandamus, quo warranto, procedendo and other original and remedial writs, and to hear and determine the same. In all other cases it shall have appellate jurisdiction only."

By the Constitution the judicial power was vested in the courts and it was vested in no other department of the government. To the courts was committed the judicial power and no other. Much has been said of the division of powers, but it was so well put by the court of appeals of Virginia in *Ratcliffe* v. *Anderson*, 31 Grat. 105, that we quote it. It was there said:

"It is now too well settled to admit of serious dispute that the legislative department can no more exercise judicial power than that the judicial department can exercise legislative power. Each is supreme in

the exercise of its own proper functions within the limits of its authority. The boundary line of these powers is plainly defined in every well-ordered government; and in this country it is now a well-established principle of public law that the three great powers of government—the legislative, the executive, and the judicial—should be preserved as distinct from and independent of each other as the nature of society and the imperfections of human institutions will permit. That system which best preserves the independence of each department approaches nearest to the perfection of civil government and the security of civil liberty."

Our inquiry here is as to whether we are called upon by the act to exercise judicial power, to perform judicial functions. If so, and if it is within the power of the legislature to enact it, we should comply with the mandate of the legislature without question as to its wisdom or its practicability. On the other hand, if we are clearly of the opinion that under the Constitution we are not and cannot be called upon to exercise such power and perform such functions, we should say so, and without hesitation. We should, and do, approach the question having in mind the well recognized rule that it should clearly appear that the act is invalid before we declare it to be in conflict with the Constitution. But if we are clearly satisfied that the Constitution has been infringed by the legislature, a co-ordinate branch of the government, we have but one duty: that of sustaining the Constitution and declaring the act invalid.

This character of proceeding owes its origin to the English practice, although it is said that it is found in the Roman law; but as England has no written constitution and the English courts but follow the mandates of parliament the decisions of the English courts are of no avail upon the question now under consideration. The act before us, together with a modified form of it in Wisconsin (Laws of Wisconsin, 1919, chap.

242) and Florida (Laws of Florida, 1919, No. 75), is the first attempt in this country, so far as we have been able to ascertain, to make the courts the legal advisers of everybody. But the attempt to make the judicial department the adviser of other departments is practically as old as the government itself. In 1793, when this country was still in its swaddling clothes, President Washington, through Mr. Jefferson, his secretary of state, requested the Justices of the Supreme Court to answer a series of questions comprehending the differences between the executive and the minister of France relative to the exposition of the treaties between the two countries. But the Justices replied that

"Considering themselves merely as constituting a legal tribunal for the decision of controversies brought before them in legal form, those gentlemen deemed it improper to enter the field of politics, by declaring their opinions on questions not growing out of the case before them." 5 Marshall's Life of Washington, pp. 433, 441; 2 Story on the Constitution (5th Ed.), § 1571.

By the act of March 23, 1792 (1 U. S. Stat. at Large, p. 243), congress provided for certain pensions and required the circuit courts to examine the proofs and determine to whom and in what amount pensions should be allowed and certify the same to the secretary of war. Chief Justice Jay, Mr. Justice Cushing, and District Judge Duane unanimously agreed

"That neither the legislative nor the executive branches can constitutionally assign to the judicial any duties but such as are properly judicial, and to be performed in a judicial manner,"

and held that the duties assigned were not of that description. *Hayburn's Case*, 2 Dall. (U. S.) 409, and note 410.

By the treaty of 1819 between the United States and Spain this country agreed to cause satisfaction to be

made for injuries to Spanish officers and inhabitants by reason of the operations of the American army in Florida. Congress by two acts (Act of March 3, 1823, 3 U. S. Stat. at Large, p. 768, and Act of June 26, 1834, 6 U. S. Stat. at Large, p. 569) made provisions to carry out these obligations by directing the judges of the territorial court of Florida to receive, examine and adjudge all claims and report their decisions to the secretary of the treasury who, on being satisfied that they were just and equitable, should pay the same. In *United States* v. *Ferreira,* 13 How. (U. S.) 40, the question arose as to whether an appeal could be had to the Supreme Court. This involved the question of whether the territorial court of Florida was exercising judicial powers. The appeal was dismissed; in the course of the opinion it was said:

"It is too evident for argument on the subject, that such a tribunal is not a judicial one, and that the act of congress did not intend to make it one. The authority conferred on the respective judges was nothing more than that of a commissioner to adjust certain claims against the United States; and the office of judges, and their respective jurisdictions, are referred to in the law, merely as a designation of the persons to whom the authority is confided, and the territorial limits to which it extends. The decision is not the judgment of a court of justice. It is the award of a commissioner."

See, also, the note to this case inserted by order of the court.

In *Gordon* v. *United States,* 117 U. S. 697, appendix, Chief Justice Taney, in what is said to have been the last opinion prepared by him, considers quite fully the question of judicial power. The case before the court was one in which congress had authorized an appeal from the court of claims. We quote at length from this opinion:

"But whether this court can be required or author-

ized to hear an appeal from such a tribunal, and give an opinion upon it without the power of pronouncing a judgment, and issuing the appropriate judicial process to carry it into effect, is a very different question, and rests on principles altogether different. The Supreme Court does not owe its existence or its power to the legislative department of the government. It is created by the Constitution, and represents one of the three great divisions of power in the government of the United States, to each of which the Constitution has assigned its appropriate duties and powers, and made each independent of the other in performing its appropriate functions. The power conferred on this court is exclusively judicial, and it cannot be required or authorized to exercise any other.    *    *    *

"The existence of this court is, therefore, as essential to the organization of the government established by the Constitution as the election of a president or members of congress. It is the tribunal which is ultimately to decide all judicial questions confided to the government of the United States. No appeal is given from its decisions, nor any power given to the legislative or executive departments to interfere with its judgments or process of execution. Its jurisdiction and powers and duties being defined in the organic law of the government, and being all strictly judicial, congress cannot require or authorize the court to exercise any other jurisdiction or power, or perform any other duty.    *    *    *

"The position and rank, therefore, assigned to this court in the government of the United States, differ from that of the highest judicial power in England, which is subordinate to the legislative power, and bound to obey any law that parliament may pass, although it may, in the opinion of the court, be in conflict with the principles of *Magna Charta* or the Petition of Rights.    *    *    *

"The appellate power and jurisdiction are subject to such exceptions and regulations as the congress shall make. But the appeal is given only from such inferior courts as congress may ordain and establish to carry into effect the judicial power specifically granted to the United States.    *    *    *    Nor can congress authorize or require this court to express an

opinion on a case where its judicial power could not be exercised, and where its judgment would not be final and conclusive upon the rights of the parties, and process of execution awarded to carry it into effect.

"The award of execution is a part, and an essential part of every judgment passed by a court exercising judicial power. It is no judgment, in the legal sense of the term, without it. Without such an award the judgment would be inoperative and nugatory, leaving the aggrieved party without a remedy. It would be merely an opinion, which would remain a dead letter, and without any operation upon the rights of the parties, unless congress should at some future time sanction it, and pass a law authorizing the court to carry its opinion into effect. Such is not the judicial power confided to this court, in the exercise of its appellate jurisdiction; yet it is the whole power that the court is allowed to exercise under this act of congress."

It will be noted that in each of the three cases last considered there was no power in the court to enter a final judgment and enforce such judgment by process, an essential element of the judicial power. We shall later have occasion to refer to the holdings of the Supreme Court of the United States where the question of judicial power was involved.

We are mindful of the fact that in seven of the States of the Union (Colorado, Florida, Maine, Massachusetts, New Hampshire, Rhode Island and South Dakota) by the constitutions of those States the legislative or executive departments may request opinions of the Supreme Court on important questions; but we are likewise mindful that such opinions are regarded as expressing the views of the justices and not a judicial determination of the question by the court; and such opinions are not regarded as binding upon the legislature, the executive, or the court itself; indeed, the court does not act as a court in rendering such opinions but as the constitutional advisers of the other departments of the government. *Opinion of the*

*Justices,* 126 Mass. 566; *State* v. *Cleveland,* 58 Me. 572; *Green* v. *Commonwealth,* 12 Allen (Mass.), 155, 164. But our Constitution contains no such provisions, no such requirement, and grants no such power.

Undoubtedly the advocates of this measure gather more comfort and find more support for their position in the holdings of some of the western States involving their irrigation laws than from any one source other than papers prepared by its advocates. Without detailing all the provisions of these irrigation laws, it will suffice to say that they are similar in character, providing for the formation of irrigation districts, the levying of taxes, perfection of an organization to carry on the project, and provide for a submission to the courts of their proceedings, a hearing of which notice is given and a determination by the court as to the regularity and validity of the proceedings. Their validity has been frequently assailed and quite uniformly upheld by the courts of last resort of the several States. The usual ground of attack has been that they do not provide for due process of law, but in several instances they have been assailed on the ground that the power conferred upon the court was not judicial power. These holdings, however, lose much of their value as authority upon the question of judicial power from the fact that one of them (involving the California act) found its way to the United States Supreme Court in *Tregea* v. *Irrigation District,* 164 U. S. 179 (17 Sup. Ct. Rep. 52). It was there said by the court, speaking through Mr. Justice Brewer and considering the determination of the district court as to the validity of the proceedings:

"But going beyond this matter, we are confronted with the question whether, in advance of the issue of bonds and before any obligation has been assumed by the district, there is a case or controversy with opposing parties, such as can be submitted to and can com-

pel judicial consideration and judgment.   This is no mere technical question.   For, notwithstanding the adjudication by the courts of the State in favor of the validity of the order made for the issue of four hundred thousand dollars of bonds, and, notwithstanding any inquiry and determination which this court might make in respect to the matters involved, there would still be no contract executed; no obligation resting on the district.   All that would be accomplished by our affirmance of the decision of the State court would be an adjudication of the right to make a contract, and, unless the board should see fit to proceed in the exercise of the power thus held to exist, all the time and labor of the court would be spent in determining a mere barren right—a purely moot question.

"We are not concerned with any question as to what a State may require of its judges and courts, nor with what measures it may adopt for securing evidence of the regularity of the proceedings of its municipal corporations.   It may authorize an auditor or other officer of State to examine the proceedings and make his certificate of regularity conclusive evidence thereof, or it may permit the district to appeal to a court for a like determination, but in either event it is a mere proceeding to secure evidence.   *   *   *

"It may well be doubted whether the adjudication really binds anybody."

While the advocates of this measure insist that the proceedings authorized by the act do not constitute a moot case, and while the proceedings may not square in all particulars with the technical definition of a moot case, they are such in every essential.   The act contemplates determinations of abstract propositions of law before any cause of action has accrued or before any wrong has been committed, or before any damages have been occasioned or threatened; it does not contemplate final process to put the determination of the court into force unless there be a further proceeding on application by petition (section 3).   It contemplates construction of deeds and other written instruments when no one is questioning their construc-

tion, and the determination of rights under contracts which have not been breached and never will be. In short, it requires that the time of the court shall be taken, not in the determination of actual controversies where rights have been invaded and wrongs have been done, but in the giving of advice to all who may seek it. If the proceedings do not square with the technical definition of a "moot case" they possess all of its objectionable characteristics, and in every essential it attempts to legalize what before was considered by many courts and text writers a contempt of court—the presentation of a moot case. Mr. Bouvier says (2 Bouvier's Law Dict., p. 2245) :

"Any attempt by a mere colorable dispute, to obtain the opinion of a court upon a question of law, when there is no real controversy, is an abuse which courts have always reprehended and treated as a punishable contempt of court."

But to resume the consideration of the cases thought to be applicable by the proponents of this act. They challenge our attention to two California cases: *Title, etc., Restoration Co.* v. *Kerrigan,* 150 Cal. 289 (88 Pac. 356, 8 L. R. A. [N. S.] 682), and *Robinson* v. *Kerrigan,* 151 Cal. 40 (90 Pac. 129). The first of these cases involved the "McEnerney act," an act passed after the records of title had been destroyed by the San Francisco earthquake. It was an act "for the establishment and quieting of title to real estate in case of the loss or destruction of records"; the second involved the act adopting the Torrens system. The proceeding contemplated by both acts was a proceeding to quiet title, a well-recognized field for the exercise of equitable jurisdiction and the cases are not persuasive of the validity of the act here under consideration.

Attention at this point should be given to two Ohio cases (*Miami County* v. *City of Dayton,* 92 Ohio St. 215 [110 N. E. 726], and *Thompson* v. *Redington,* 92 Ohio

St. 101 [110 N. E. 652; Ann. Cas. 1918A, 1161]).   In
the first of these cases legislation to prevent floods and
to authorize the organization of drainage and conserva-
tion districts was involved.   While the opinion does not
exhaustively deal with the question of judicial power,
in so far as it does deal with that question what we
have said of the irrigation laws is quite applicable,
as the organization of the drainage district and the
functions of the courts are somewhat analogous to the
provisions found in the irrigation laws.   The second
of these cases involved the power of the legislature to
authorize the conduct of a contest over an election in
the courts.   It is significant to note that the court ex-
pressly held that under the clause of the constitution
of that State similar to ours conferring the judicial
power on the court, that it was beyond the power of
the legislature to require the courts to hear such con-
tests, but that under another clause of the constitution
which has no counterpart in our Constitution such
power existed and that both sections should be con-
strued and given effect.   Neither of these cases mili-
tate against what was said by that court in *State* v.
*Baughman,* 38 Ohio St. 455, from which we shall later
quote.

Counsel also say that in proceedings to determine
heirship the courts have exercised powers analogous
to those here involved.   They say such determination
of the courts are binding and cite us to *Fitzpatrick* v.
*Simonson Bros. Manfg. Co.,* 86 Minn. 140 (90 N. W.
378), which does so hold.   One difficulty in following
this case, however, and it is a sufficient one, lies in the
fact that this court has held exactly to the contrary
in *Lorimer* v. *Wayne Circuit Judge,* 116 Mich. 682,
where our act was under consideration and where we
said of such proceedings:

"The act under which the proceedings were insti-
tuted does not purport to make the proceedings of the

probate court conclusive upon anybody. They are not binding even upon the relator. The petitioner, or other person interested, if not satisfied with the findings, might, in any judicial proceeding, resort to original evidence, and wholly ignore the action of the probate court. The proceeding simply makes evidence, and any common-law jury could overturn it in any other proceeding."

But the supreme court of Minnesota has quite definitely gone on record on the question of what is judicial power. The legislature of that State passed an act requiring the supreme court to give advisory opinions to the legislature on request by either house. In *Re Application of the Senate*, 10 Minn. 78, the court had before it a request for such an opinion. It was held that the act was unconstitutional in that it required of the court the exercise of other than judicial power, and it was said:

"The duty sought to be imposed by the section of the act referred to, is clearly, neither a judicial act nor is it to be performed in a judicial manner. It constitutes the supreme court the advisers of the legislature, nothing more. This does not come within the provisions of the constitution, and, as the constitution now stands, would be, in our opinion, not only inconsistent with judicial duties, but a dangerous precedent. The impropriety of an unauthorized expression of opinion by a judge or court, especially one of last resort, upon a matter which may subsequently come before the court for adjudication, will immediately suggest itself. If the statute under consideration is in conflict with the constitution it imposes no duty, and any opinion expressed in pursuance of action under it, is extra-judicial, and no official responsibility attaches to the judge or court, voluntarily giving it. The evils which might result to the people from such a source will suggest themselves on a moment's reflection."

Nor are we persuaded that the New Jersey cases sustain counsel's contention. While it is true that the New Jersey court of equity had prior to the enactment

of chapter 116, Laws of 1915, declined to construe wills and thereafter assumed such jurisdiction in cases where under the wording of the act persons "claiming a right cognizable in a court of equity," invoked such jurisdiction, we do not understand that the later cases which have been decided since the act was passed have treated the constitutional question or determined that the act was valid. But be that as it may, this court has for many years construed wills in equity cases and in proper cases have recognized the jurisdiction of the chancery court to construe wills, and such jurisdiction has been exercised without question.

Our attention has also been challenged to cases from other jurisdictions where the courts have entertained direct proceedings to review the action of the executive. But these cases are not in accord with our holding in *Germaine* v. *Governor*, 176 Mich. 585 (46 L. R. A. [N. S.] 857, Ann. Cas. 1915B, 418).

We feel constrained to state that we have not found any cases in the briefs of any of the counsel who seek to sustain the act which are at all convincing to our minds that the act in question calls upon the courts to exercise judicial powers or to hear other than matters which are to all intents and purposes "moot" cases.

We shall now, without going into the details as to how the question arose, quote from some of the cases which have dealt with the power of the court to consider cases in which no wrongs have been sought to be redressed and where no rights have been invaded and where no actual controversy existed.

"But there is another and stronger reason why the bill in this case should not be entertained. A court of equity will not take jurisdiction, unless it can afford immediate relief, and certainly will not undertake, where there is no matter in dispute, to *declare future rights*. *Heald* v. *Heald*, 56 Md. 300. It will never undertake to decide upon and determine a contingency.

211—Mich.—39.

that may never arise, unless such determination is necessary for the decision of some immediate relief to be granted, and which the court can enforce by a decree." *Woods* v. *Fuller*, 61 Md. 457.

"Where a complainant has sustained no injury and the object of the action is merely to obtain a declaration as to the constitutionality of a legislative act, the question presented to the court is merely an abstract one and the action will be dismissed.   *   *   *
"Abstract questions cannot be made the subject of an action.   They will not be answered, although it may appear that at some time in the future they will probably be the subject of a real controversy.   A question which the courts will entertain must be in an action or proceeding where the necessary parties are before it, in which there is a subject-matter, and where the determination of the court can be placed in a judgment or final order forever controlling upon the parties and their privies, and in which final process can be issued to carry the judgment or order into effect." *Hanrahan* v. *Terminal Station Commission*, 206 N. Y. 494 (100 N. E. 414).

"Where it is apparent that the object of a case is not the vindication of a right, but a desire to obtain an interpretation of a statute by a test case, this court will not assume jurisdiction of the cause." *Sennette* v. *Police Jury*, 129 La. 728 (56 South. 653).

"It is universally understood by the bench and bar, on the contrary, that a moot case is one which seeks to get a judgment on a pretended controversy, when in reality there is none, or a decision in advance about a right before it has been actually asserted and contested, or a judgment upon some matter which, when rendered, for any reason, cannot have any practical legal effect upon a then existing controversy. The only way a disputed right can ever be made the subject of judicial investigation is, first, to exercise it, and then, having acted, to present a justiciable controversy in such shape that the disputed right can be passed upon in a judicial tribunal, which can pronounce the right and has the power to enforce it." *Ex parte Steele*, 162 Fed. 694.

"It is well settled that a court will never entertain a suit to give a construction or declare the rights of parties upon a state of facts which has not yet arisen, nor upon a matter which is future, *contingent* and uncertain."   *Wahl* v. *Brewer*, 80 Md. 237 (30 Atl. 654).

"Whether the complainant will ever acquire any title to the lot depends upon his payment of the purchase price within the time agreed upon, and the only possible effect of a decision of the question discussed by counsel would be to have this court certify what title Harry Goodman now has and what title the complainant will acquire if he chooses to avail himself of the option.   The bill states all the facts upon which the question of title depends and the plea merely reiterates the same facts with immaterial additions, so that there appears to be no real controversy between the parties, and a court cannot properly be used, for mere business reasons, to decide whether the complainant will get an absolute estate in fee on complying with the terms of the option, or a limited estate."   *Lonergan* v. *Goodman*, 241 Ill. 200 (89 N. E. 349).

"What the plaintiff (by the additional prayer set forth above) in effect asks the court to do is to enter a declaratory decree stating that the release of the Whipple mortgage operated as an assignment of that mortgage and that that mortgage now has come to the plaintiff.   But on this bill no relief can be granted to the plaintiff on that declaration of his rights, if he is entitled to it.   Where all that is sought by a plaintiff is a declaratory decree not the subject of relief to be based upon it, there is no jurisdiction in equity and the bill must be dismissed."   *Hanson* v. *Griswold*, 221 Mass. 228 (108 N. E. 1035).

"It is not the office of courts to give opinions on abstract propositions of law, or to decide questions upon which no rights depend, and when no relief can be afforded.   Only real controversies and existing rights are entitled to invoke the exercise of their powers."   *Hamer* v. *Commonwealth*, 107 Va. 636 (59 S. E. 400).

"We are to decide questions arising and undetermined in a case pending, and we may 'not tender ad-

vice upon matters not in litigation.' " *Snell* v. *Welch,* 28 Mont. 482 (72 Pac. 988).

"The question of the exemption of the work-bench from attachment and execution, does not arise in the case. It is true, the parties have attempted to present it, and have expressly agreed that judgment shall be rendered according to our opinion upon this question. But neither parties nor their counsel have any right to make their cases turn upon any thing but their own intrinsic merits; or to call upon the court by fictitious actions or assumed facts, to decide mere speculative questions. The former would partake of the nature of gambling and the latter would convert the highest tribunal in the State into a moot court to decide questions which might never arise, or to lay down rules for the government of cases in which the real parties would have no opportunity to be heard." *Smith* v. *Cudworth,* 24 Pick. (Mass.) 196.

"It is not sufficient that the parties be real and not fictitious, but the controversy must be real and not *pro forma,* nor is it sufficient that the facts exist as they are set out in the action; nor that the complainant has a cause of action, but beyond these, the question arises, Is the suit prosecuted to redress the grievance of the plaintiff, or to affect third persons, who may be interested in the same question already pending in another suit, and which is the primary and real object of the proceeding? If the latter, the suit should be dismissed. Courts cannot be used for the purpose of deciding even real questions in *pro forma* suits, especially when the object and purpose is to affect important litigation between other parties. If so, the most complicated and difficult questions of law, and the constitutionality of statutes might be settled by the court upon such *pro forma* proceedings, when no real controversy or adverse interests exist, and no proper examination of the important questions is made by counsel or the court." *Ward* v. *Alsup,* 100 Tenn. 619, 740 (46 S. W. 573).

"Courts of judicature are organized only to decide real controversies between actual litigants. When, therefore, it appears, no matter how nor at what stage,

that a pretended action is not a genuine litigation over a contested right between opposing parties, but is merely the proffer of a simulated issue by a person dominating both sides of the record, the court, from a sense of its own dignity, as well as from regard to the public interests, will decline a determination of the fabricated case so fraudulently imposed upon it." *Judson* v. *Flushing Jockey Club*, 36 N. Y. Supp. 126.

"A decision on any of the questions suggested, not necessary to a determination of the right of defendants to exercise these functions, would not be a judicial settlement of such questions, but would be without authority conferred by the constitution to make it. To be a judicial settlement the question decided must arise in a judicial proceeding, properly before a court of competent jurisdiction. The division of the powers of the State into legislative, executive and judicial, and the confiding of these powers to distinct departments, is fundamental.

"It is essential to the harmonious working of this system that neither of these departments should encroach on the powers of the other. If the judiciary were to assume to decide hypothetical questions of law not involved in a judicial proceeding in a cause before it, even though the decisions 'would be of great value to the general assembly' in the discharge of its duties, it would, nevertheless, be an unwarranted interference with the functions of the legislative department that would be unauthorized, and dangerous in its tendency.   *   *   *

"In some of the States, Massachusetts included, the constitution authorizes the legislature and the governor to require of their highest judicial tribunal its opinion on important questions of law, the decision of which become necessary to the discharge of their public duties. Even under such a provision the judiciary must confine itself to an opinion on such questions as are involved in or necessary to the discharge of a public duty by the inquiring body. This power does not include the right to require an opinion on abstract or hypothetical questions however valuable as a future guide, nor to such questions as affect private rights merely." *State* v. *Baughman*, 38 Ohio St. 455.

"The power involves not only the power to hear and determine a cause, but also the power and jurisdiction to adjudicate and determine the rights of the parties to the controversy and to render a judgment or decree which will be effectual and binding upon them in respect to their personal or property rights in controversy in such proceedings. *O'Brien* v. *People*, 216 Ill. 354 (75 N. E. 108). The power to hear without the power also to adjudicate and determine the rights of the parties to such proceedings cannot be said to be the exercise of the judicial power as that term is used in the constitution of this State." *Devine* v. *Brunswick-Balke-Collender Co.*, 270 Ill. 504 (110 N. E. 780, Ann. Cas. 1917B, 887).

"The plaintiffs take whatever they may be entitled to under the will, not in their character as executors, or in trust, but in their own right. They present no question touching the proper disposition of trust funds, but request the court to inform them what their legal rights and those of the defendants are in the property devised. The court might with equal propriety be called upon by the parties interested to advise them regarding the title to land, the construction of a contract, or any other question of law. Such questions are not ordinarily adjudicated until it becomes necessary to decide them in proceedings instituted for the redress of wrongs." *Greeley* v. *City of Nashua*, 62 N. H. 166.

"The distinction between a judicial and a legislative act is well defined. The one determines what the law is, and what the rights of parties are, with reference to transactions already had; the other prescribes what the law shall be in future cases arising under it." *Sinking-Fund Cases*, 99 U. S. 700, 761.

"The duty of this court is limited to actual pending controversies. It should not pronounce judgment on abstract questions, even if its opinion might influence future action under like circumstances." *Richardson* v. *McChesney*, 218 U. S. 487 (31 Sup. Ct. Rep. 43).

"When the judgment appealed from cannot be affected by the decision of the appellate court the case becomes a moot one and the appeal should be dis-

missed; hearing and deciding such an appeal for the purpose of establishing a rule of observance in cases subsequently arising is not an exercise of judicial power." *United States* v. *Evans,* 213 U. S. 297 (29 Sup. Ct. Rep. 507).

"The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property, which are actually controverted in the particular case before it.   When, in determining such rights, it becomes necessary to give an opinion upon a question of law, that opinion may have weight as a precedent for future decisions.   But the court is not empowered to decide moot questions or abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it.   No stipulation of parties or counsel, whether in the case before the court or in any other case, can enlarge the power, or affect the duty, of the court in this regard." *California* v. *Railroad Co.,* 149 U. S. 308 (13 Sup. Ct. Rep. 876).

"The question presented to the court is, therefore, merely an abstract one; such a one as no court can be called upon to decide, and the bill shows no equity in the complainant." *William's* v. *Hagood,* 98 U. S. 72.

One other case disposed of by the Supreme Court of the United States should be considered somewhat at length.   By the act of March 1, 1907, 34 U. S. Stat. at Large, pp. 1015, 1028, chap. 2285, David Muskrat and others on behalf of themselves and other Cherokee citizens were authorized to institute proceedings in the court of claims with a right of appeal to the Supreme Court,

"* * * to determine the validity of any acts of congress passed since the said act of July first, nineteen hundred and two, in so far as said acts, or any of them, attempts to increase or extend the restrictions upon alienation, encumbrance, or the right to lease the allotments of lands of Cherokee citizens, or to increase the number of persons entitled to share

in the final distribution of lands and funds of the Cherokees beyond those enrolled for allotment as of September first, nineteen hundred and two, and provided for in the said act of July first, nineteen hundred and two."

The proceedings authorized by this act were instituted and brought to the Supreme Court on appeal. That court in a very able and exhaustive opinion by Mr. Justice Day (*Muskrat* v. *United States,* 219 U. S. 346 [31 Sup. Ct. Rep. 250]), fully reviews the authorities and reaches the conclusion that the act of March 1, 1907, by which the Supreme Court was authorized to determine the validity of various acts having reference to the Indian tribes, was in excess of legislative authority, and that the congress had no power to confer power other than judicial upon the court, or to require of it other than judicial action; that the proceedings there under consideration did not require the exercise of judicial power and ordered a dismissal of the proceedings. After reviewing the authorities the court said:

"It is therefore evident that there is neither more nor less in this procedure than an attempt to provide for a judicial determination, final in this court, of the constitutional validity of an act of congress. Is such a determination within the judicial power conferred by the Constitution, as the same has been interpreted and defined in the authoritative decisions to which we have referred? We think it is not. The judicial power, as we have seen, is the right to determine actual controversies arising between adverse litigants, duly instituted in courts of proper jurisdiction. The right to declare a law unconstitutional arises because an act of congress relied upon by one or the other of such parties in determining their rights is in conflict with the fundamental law. The exercise of this, the most important and delicate duty of this court, is not given to it as a body with revisory power over the action of congress, but because the rights of the litigants in justiciable controversies require the court to choose

between the fundamental law and a law purporting to be enacted within constitutional authority, but in fact beyond the power delegated to the legislative branch of the government. This attempt to obtain a judicial declaration of the validity of the act of congress is not presented in a 'case' or 'controversy,' to which, under the Constitution of the United States, the judicial power alone extends. It is true the United States is made a defendant to this action, but it has no interest adverse to the claimants. The object is not to assert a property right as against the government, or to demand compensation for alleged wrongs because of action upon its part. The whole purpose of the law is to determine the constitutional validity of this class of legislation, in a suit not arising between parties concerning a property right necessarily involved in the decision in question, but in a proceeding against the government in its sovereign capacity, and concerning which the only judgment required is to settle the doubtful character of the legislation in question. Such judgment will not conclude private parties, when actual litigation brings to the court the question of the constitutionality of such legislation. In a legal sense the judgment could not be executed, and amounts in fact to no more than an expression of opinion upon the validity of the acts in question. Confining the jurisdiction of this court within the limitations conferred by the Constitution, which the court has hitherto been careful to observe, and whose boundaries it has refused to transcend, we think the congress, in the act of March 1, 1907, exceeded the limitations of legislative authority, so far as it required of this court action not judicial in its nature within the meaning of the Constitution."

This case should forever put at rest this question. It is absolutely decisive of the question before us.

To those who desire to further pursue the subject, we commend the following: Miller on Constitution of U. S., p. 313; 24 American Law Review, p. 369; Black's Constitutional Law (2d Ed.), p. 87; *New Orleans, etc., R. Co.* v. *Ferry Co.*, 104 La. 53 (28 South. 840); *Reply of Judges*, 33 Conn. 586; *McDaniel* v.

*Hurt,* 88 Miss. 769 (41 South. 381); *Shephard* v. *Wheeling,* 30 W. Va. 479 (4 S. E. 635); *Blake* v. *Askew,* 76 N. C. 325; *Muskogee Gas & Electric Co.* v. *Haskell,* 38 Okla. 358 (132 Pac. 1098, Ann. Cas. 1915A, 190); *Horrabin* v. *Iowa City,* 160 Iowa, 650 (130 N. W. 150, 142 N. W. 212); *Taylor & Co.* v. *Place,* 4 R. I. 324; *Bank of Pt. Gibson* v. *Dickson,* 4 Smedes & Mar. (Miss.), 689; *Jones* v. *Montague,* 194 U. S. 147 (24 Sup. Ct. Rep. 611); *Baird* v. *City of Atlanta,* 131 Ga. 451 (62 S. E. 525); *Barrs* v. *Peacock,* 65 Fla. 12 (61 South. 118); *Coryell* v. *Fawcett,* 54 Colo. 353 (130 Pac. 838); *State, ex rel. Jameson,* v. *Denny,* 118 Ind. 382 (21 N. E. 252, 4 L. R. A. 79); *Smith* v. *Railway Co.,* 29 Ind. 546; *Ludlow* v. *Murphy* (Ky.), 105 S. W. 887; *Hazen* v. *Railroad,* 63 N. H. 390; *Dunston* v. *Insurance Co.,* 136 N. Y. Supp. 674; *Deines* v. *Schwind,* 89 Neb. 122 (130 N. W. 1051); *United States* v. *Hamburg-American Co.,* 239 U. S. 466 (36 Sup. Ct. Rep. 212); *Schinz* v. *Schinz,* 90 Wis. 236 (63 N. W. 162); *Collins* v. *Collins,* 19 Ohio St. 468; *Little* v. *Thorne,* 93 N. C. 69.

We have thus far considered the holdings from other jurisdictions. This has largely been due to the fact that the advocates of the measure in the main studiously avoided any consideration of our own cases and have evidently thought those from other jurisdictions persuasive of their claims. We have, we think, demonstrated that the holdings of the courts of other jurisdictions are substantially unanimous in agreeing that power like that conferred in the act now before us is not judicial power and is beyond the authority of the legislature to confer. We shall now consider some of our own cases. In *Hipp* v. *Charlevoix County Supervisors,* 62 Mich. 456, this court, speaking through Chief Justice CAMPBELL, said:

"The controversy, which is not in any proper sense a judicial one, is closed. The Constitution has not

empowered this court to settle controversies not judicial." * * *

In *Post* v. *Campau*, 42 Mich. 90, it was said:

"The elements of a cause of action are, *first*, a breach of duty owing by one person' to another; and *second*, a damage resulting to the other from the breach. Damage, where no duty is violated, is *damnum absque injuria;* a neglect of duty, where no loss occurs, is equally incapable of giving a right of action."

In the case of *People* v. *Dickerson*, 164 Mich. 148 (33 L. R. A. [N. S.] 917, Ann. Cas. 1912B, 688), this court had under consideration the validity of section 3, Act No. 175, Pub. Acts 1905. This section in substance directed the trial court in homicide cases to appoint experts who should investigate and give testimony on the trial. Considering the validity of this provision it was held that the court in selecting and appointing such experts performed no judicial act and that the section was in conflict with the Constitution. Speaking through Mr. Justice BROOKE, it was there said:

"We think it clear that the preparation for and conduct of the trial on behalf of the people are acts executive and administrative in character. Under our Constitution, which jealously separates the powers of government into legislative, executive, and judicial departments, the powers and duties properly belonging to one department cannot by statutory enactment be granted to or imposed upon another department. *Houseman* v. *Kent Circuit Judge*, 58 Mich. 364; *Locke* v. *Speed*, 62 Mich. 408; *City of Manistee* v. *Harley*, 79 Mich. 238; *Allen* v. *Board of State Auditors*, 122 Mich. 324 (47 L. R. A. 117, 80 Am. St. Rep. 573).

"The power of selecting and appointing witnesses who shall, after appointment, acquaint themselves with the matter in controversy, and testify concerning the same, is in no sense a judicial act, and, if exercised by the court in accordance with the mandate of section 3, would entirely change the character of

criminal procedure, and would seriously endanger, if not absolutely destroy, those safeguards which our Constitution has so carefully enacted for the protection of the accused."

In *Brown* v. *Kalamazoo Circuit Judge*, 75 Mich. 274 (5 L. R. A. 226), this court had before it the validity of an act providing for trials by jury in equity cases and making the verdict of the jury final. It was held to be beyond the power of the legislature to take from the equity court its power to determine questions of fact as well as of law and it was said, Justice CAMPBELL speaking for the court:

"The right to have equity controversies dealt with by equitable methods is as sacred as the right of trial by jury. Whatever may be the machinery for gathering testimony or enforcing decrees, the facts and the law must be decided together; and when a chancellor desires to have the aid of a jury to find out how facts appear to such unprofessional men, it can only be done by submitting single issues of pure fact, and they cannot foreclose him in his conclusions unless they convince his judgment.   *   *   *

"The system of chancery jurisprudence has been developed as carefully and as judiciously as any part of the legal system, and the judicial power includes it, and always must include it. Any change which transfers the power that belongs to a judge, to a jury, or to any other person, or body, is as plain a violation of the Constitution as one which should give the courts executive or legislative power vested elsewhere. The cognizance of equitable questions belongs to the judiciary as a part of the judicial power, and under our Constitution must remain vested where it always has been vested heretofore."

In the recent case of *Heck* v. *Bailey*, 204 Mich. 54, it was said:

"Courts do not speak through their opinions but through their judgments and decrees."

But if we should lay aside everything else that has

been said by this court, we think it must be held that the present question cannot be distinguished from the one before the court in *Lloyd* v. *Wayne Circuit Judge,* 56 Mich. 236. The legislature by Act No. 25, Pub. Acts 1883, had provided for a proceeding in court to establish the will of a living person. The question there involved was the same as here, Does the act confer judicial power on the court? This question was answered in the negative in two opinions to the same effect, one by Chief Justice COOLEY, and the other by Justice CAMPBELL. Both opinions were concurred in by Justices SHERWOOD and CHAMPLIN. In the opinion of the Chief Justice, it was said:

"In all we have said on the subject we have assumed that the proceedings to probate the will of a living person under the statute was to be considered a judicial proceeding, and the order made thereupon a judgment. This is evidently the view taken by the proponent, who seems to assume that the adjudication will be final, though, in fact, it will at all times be subject to his own discretion or caprice. But if he is in error in treating the proceeding as judicial, we do not see that the circuit court had anything to do with the case. The probate court had acted and decided against the proponent, and we know of no authority for requiring the circuit court to take cognizance of appeals in cases not properly judicial, and to give its time and attention to the making of orders which are not judgments, and which the party seeking and obtaining them is under no obligation to leave in force for a day or an hour."

And Justice CAMPBELL said:

"I am disposed to think, with the circuit judge, that this is not in any sense a judicial proceeding which he was bound to consider or entertain."

He then discusses the question at some length and concludes:

"I am of opinion that the statute is inoperative, as not within any recognized judicial power, and that the

courts cannot be called upon to administer it, and that the mandamus should vacate the whole proceedings."

Among the numerous cases in which this court has declined to consider abstract questions of law and which we have declined to decide where our conclusions could not be made effective by final judgment, decree, and process, see *Schouwink* v. *Ferguson*, 191 Mich. 284; *Carlson* v. *Wyman*, 189 Mich. 402; *Howe* v. *Doyle*, 187 Mich. 655; *East Saginaw Ry.* v. *Wildman*, 58 Mich. 286; *Hicks* v. *J. B. Pearce Co.*, 158 Mich. 502; *Brown, ex rel. Van Buren*, v. *Lawrence*, 197 Mich. 178; *Ideal Furnace Co.* v. *International Molders' Union*, 204 Mich. 311; *Blickle* v. *Board of Education*, 210 Mich. 196; *Tierney* v. *Union School District*, 210 Mich. 424.

This court and the court from which this case came by appeal draw their power from the Constitution. The power given to both under the Constitution was judicial power. It is beyond the power of the legislature to take from either that judicial power and it is equally beyond the authority of the legislature to confer upon either power not judicial, or to require the performance of functions not judicial in character. This act confers power not judicial and requires performance of acts non-judicial in character. For these reasons it is void in its entirety.

These proceedings must be dismissed, but without costs.

MOORE, C. J., and STEERE, BROOKE, and STONE, JJ., concurred with FELLOWS, J. BIRD, J., concurred in the result.

SHARPE, J. I am unable to concur in the opinion of Mr. Justice FELLOWS, holding Act No. 150 of the Public Acts of 1919 unconstitutional. In my opinion, the construction which he places on the provisions of the act is not warranted by the language employed.

I can find nothing in the act itself which places upon courts the duty to serve as "legal advisers of all seeking such advice" in advance of any existing controversy.

The purpose of the legislature in the enactment of this statute is plainly apparent. We may take judicial notice of the fact that this act was prepared under the supervision of a committee of the State Bar Association, who had given the subject much thought and consideration. The benefits to be derived by being able to secure a somewhat summary determination of controversial rights without the tedious delay incident to the ordinary lawsuit and the acrimony between litigants usually engendered thereby have long appealed to thoughtful students of legal procedure. The State legislature, many of whose members are lawyers of standing at this bar, approved the proposed legislation. To accentuate the benefits which in their opinion would accrue therefrom if administered in the spirit in which it was prepared and passed, it was provided in section 6:

"This act is declared to be remedial, and is to be liberally construed and liberally administered with a view of making the courts more serviceable to the people."

It may also be observed that while there are now two cases pending in this court, brought here under the provisions of this act, its constitutionality has not been raised by any of the eminent counsel employed therein, but was called in question by the court itself.

These considerations should move us to proceed with unusual care and deliberation in arriving at a conclusion that an act of another department of government created by the Constitution is in contravention of the power therein conferred on it by reason of its imposing duties on the judicial department which do not

pertain thereto.   As was said by Chief Justice COOLEY in *State Tax-Law Cases*, 54 Mich. 350, at page 396:

"No evil in government could well be greater than for a court to stretch its constitutional authority in order to limit, as a remedy for possible evils, the constitutional authority of another department."

No claim is made that in the performance of the duties imposed in this act the courts will thereby usurp any of the functions of either the executive or legislative departments.   The claim of unconstitutionality must rest alone on the act imposing duties upon the courts which are not judicial in their character.   The judicial power of the State is vested by the Constitution in the courts.   The legislature can in no way limit such power when it is called into action nor extend it beyond that inherent in judicial tribunals.   In 12 C. J., p. 817, after stating the rule as above, it is said:

"But an extension of jurisdiction in harmony with the court's character, and not infringing on the inherent powers of any other court, is valid."

Let us now examine the act for the purpose of ascertaining the duties therein imposed on the courts. It provides (section 1) that—

"No action or proceeding in any court of record shall be open to objection on the ground that a merely declaratory judgment, decree or order is sought thereby, and the court may make binding declarations of rights whether any consequential relief is or could be claimed, or not, including the determination, at the instance of any one claiming to be interested under a deed, will or other written instrument, of any question of construction arising under the instrument and a declaration of the rights of the parties interested."

The courts are not thereby required to pass on moot cases or to answer abstract questions of law.   There must be an action or proceeding brought in the court

by petition or bill of complaint.   This must be determined in the usual way except as modified by the provisions of the act.   The rights of the parties must be declared—that is, determined and stated—and, when ready to be promulgated in the legal form of a judgment, decree, or order, it shall not be subject to the objection that no consequential relief is or could be claimed thereunder.   In the action or proceeding, all of the parties to be affected by the determination of the court must be made parties.   The judgment, decree, or order, declaring the rights of the parties, is final and binding upon all such parties, though un-enforceable, so far as issuing execution or mandatory process is concerned, without further application to the court under section 3.   To entitle such an action or proceeding to be brought, there must be an *actual, concrete controversy, a bona fide contest* over *asserted, existing legal* rights.   All of the parties interested must be brought before the court.   A trial must be had of the issues presented in the usual way.   The court must determine the rights of all the parties interested in the controversy and a judgment, decree or order entered conforming to such determination.   The act does not authorize a mere declaration of obligation.   It is only when the plaintiff has rights in the matter, in respect of which the declaration is sought, that a declaration of rights can be made.   In my opinion, the performance of such duties is an exercise of judicial power and no other duties are imposed on the courts by this act.

The conclusion thus reached leads to a consideration of what I deem to be the only doubtful question presented:  Does the lack of power under the act to enforce obedience to the determination of the court by award of execution or mandatory process render the proceeding non-judicial?   I  cannot  so  conclude.

211—Mich.—40.

Neither do I find that this element has usually been included in defining such power.

"To adjudicate upon and protect the rights and interests of individual citizens, and to that end to construe and apply the laws, is the peculiar province of the judicial department." Cooley's Constitutional Limitations (7th Ed.), p. 132.

"The primary functions of the judiciary are to declare what the law is and to determine the rights of parties conformably thereto." 12 C. J., p. 871.

"All powers, however, even though not judicial in their nature, which are incident to the discharge by the courts of their judicial functions, are inherent in the courts." 12 C. J., p. 873.

"The term 'judicial power' includes both the power to determine controversies and to interpret laws." 6 Am. & Eng. Enc. Law (2d Ed.), p. 1053.

"The office of a judicial opinion under the common-law system is to set out the grounds upon which a legal controversy is decided in favor of one litigant and against the other, and incidentally to serve as a guide for determining similar controversies in the future." 6 Am. & Eng. Enc. Law (2d Ed.), p. 1065.

"Judicial Business. Such as involves the exercise of judicial power or the application of the mind and authority of a court to some contested matter or the conduct of judicial proceedings, as distinguished from such ministerial and other acts incident to the progress of a cause as may be performed by the parties, counsel or officers of the court without application to the court or judge." Black's Law Dictionary, p. 668.

In *Risser* v. *Hoyt*, 53 Mich. 185, 193, it is said:

"The judicial power referred to is the authority to hear and decide controversies, and to make binding orders and judgments respecting them."

In *Heck* v. *Bailey*, 204 Mich. 54, Mr. Justice BROOKE said:

"Courts do not speak through their opinions but through their judgments and decrees."

The act in question provides for a judgment, order, or decree. In that case, proceedings based on the mere opinion of the court were set aside.

*Lloyd* v. *Wayne Circuit Judge,* 56 Mich. 236, involved proceedings under an act of the legislature to establish the will of a living person. If I am right in my construction of this act, this case in no way applies. It holds that the proceeding provided for was not a controversy over existing rights and that no decree of finality could be rendered. The question of the want of power to enforce the decree was not involved. Neither was this question presented in either of the Federal cases relied on and quoted from at length by Mr. Justice FELLOWS.

*Muskrat* v. *United States,* 219 U. S. 346 (31 Sup. Ct. Rep. 250), was a case—

"brought by David Muskrat and J. Henry Dick in their own behalf and in behalf of others in a like situation to determine the constitutional validity of the act of congress of April 26, 1906, chap. 1876, 34 Stat. 137, as amended by the act of June 21, 1906, chap. 3504, 34 Stat. 325 *et seq.,* and to have the same declared invalid in so far as the same undertook to increase the number of persons entitled to share in the final distribution of lands and funds of the Cherokees beyond those enrolled on September 1, 1902, in accordance with the act of congress passed July 1, 1902, chap. 1375, 32 Stat. 716-720-721. The acts subsequent to that of July 1, 1902, have the effect to increase the number of persons entitled to participate in the division of the Cherokee lands and funds, by permitting the enrollment of children who were minors living on March 4, 1906, whose parents had theretofore been enrolled as members of the Cherokee tribe or had applications pending for that purpose."

The action originated in the court of claims, which sustained the validity of the acts. The commence-

ment of such a suit was authorized by an act of congress which provided that the parties named therein, including Muskrat, might institute a suit in such court—

"to determine the validity of any acts of congress passed since the said act of July first, nineteen hundred and two, in so far as said acts, or any of them, attempt to increase or extend the restrictions upon alienation, encumbrance, or the right to lease the allotments of lands of Cherokee citizens, or to increase the number of persons entitled to share in the final distribution of lands and funds of the Cherokees beyond those enrolled for allotment as of September first, nineteen hundred and two, and provided for in the said act of July first, nineteen hundred and two."

This act assumed to confer jurisdiction on the court of claims, with the right of appeal, by either party, "to hear, determine and adjudicate each of said suits." An appeal from the decision of the court of claims to the Supreme Court was taken by the plaintiffs. Mr. Justice Day considered at length the judicial power conferred on that court by the Constitution and reached the conclusion quoted by Mr. Justice FELLOWS in his opinion. The distinction between the question there presented and that which courts may be called upon to determine under Act No. 150 is plain and easily pointed out. The contending parties were not before the court. It was asked to determine the validity of a statute affecting the rights of individuals, none of whom had an opportunity to present their claim of right to the court. As was said in that part of the opinion quoted:

"This attempt to obtain a judicial declaration of the validity of the act of congress is not presented in a 'case' or 'controversy,' to which, under the Constitution of the United States, the judicial power alone extends."

He further says:

"Such judgment will not conclude private parties, when actual litigation brings to the court the question of the constitutionality of such legislation."

The opinion further says:

"In a legal sense the judgment could not be executed, and amounts in fact to no more than an expression of opinion upon the validity of the acts in question."

He, however, quoted approvingly from the opinion of Mr. Justice Brewer in *Chicago, etc., R. Co.* v. *Wellman,* 143 U. S. 339 (12 Sup. Ct. Rep. 400), as follows:

"Whenever, in pursuance of an honest and actual antagonistic assertion of rights by one individual against another, there is presented a question involving the validity of any act of any legislature, State or Federal, and the decision necessarily rests on the competency of the legislature to so enact, the court must, in the exercise of its solemn duties, determine whether the act be constitutional or not; but such an exercise of power is the ultimate and supreme function of courts. It is legitimate only in the last resort, and as a necessity in the determination of real, earnest and vital controversy between individuals. It never was the thought that, by means of a friendly suit, a party beaten in the legislature could transfer to the courts an inquiry as to the constitutionality of the legislative act."

Much stress is laid upon the language contained in an opinion written by Chief Justice Taney in *Gordon* v. *United States,* published in the appendix to 117 U. S., at page 697. In that case the constitutionality of "an act to amend an act to establish a court for the investigation of claims against the United States" was considered. The act provided for an appeal to the Supreme Court from certain decrees of the court of claims, and further provided that after final allowance the claim should only be paid after an appropriation therefor should be estimated by the secretary of the treasury. Chief Justice Taney comments on this, saying:

"Whether it is paid or not, does not depend on the decision of either court, but upon the future action of the secretary of the treasury, and of congress."

He then discusses the judicial power of the Supreme Court as an appellate tribunal, using the language quoted in the majority opinion. Following the last quotation therefrom, he says:

"It is true the act speaks of the judgment or decree of this court. But all that the court is authorized to do is to certify its opinion to the secretary of the treasury, and if he inserts it in his estimates, and congress sanctions it by an appropriation, it is then to be paid, but not otherwise. And when the secretary asks for this appropriation, the propriety of the estimate for this claim, like all other estimates of the secretary, will be opened to debate, and whether the appropriation will be made or not will depend upon the majority of each house. The real and ultimate judicial power will, therefore, be exercised by the legislative department, and not by that department to which the Constitution has confided it."

He then refers to and comments on *Hayburn's Case*, 2 Dall. (U. S.), 409, and *United States* v. *Ferreira*, 13 How. (U. S.), 40, in which the court declined to give advisory opinions to the executive department subject to revision by it and by congress. A careful reading of this opinion satisfies me that it was based on the lack of finality in the conclusion to be reached and judgment rendered by the court rather than the want of power in the court to enforce obedience to its order. This view is emphasized by the opinion rendered by Chief Justice Chase (that of Chief Justice Taney not having been filed). See *United States* v. *Jones*, 119 U. S. 478, in which he said:

"We think that the authority given to the head of an executive department by necessary implication in the 14th section of the amended court of claims act, to revise all the decisions of that court requiring payment

of money, denies to it the judicial power from the exercise of which alone appeals can be taken to this court."

It may be observed that the Supreme Court of the United States has frequently rendered judgments under statutes which provided for mere declarations of rights.  In *United States* v. *Fossatt,* 21 How. (U. S.) 445, the appeal reviewed the action of the district court for the northern district of California in confirming a grant of certain lands to Fossatt.  The act (4 Stat. at Large, p. 52, § 2) required the courts—

"by a final decree, to settle and determine the question of the validity of the title according to the law of nations, the stipulations of any treaty and proceedings under the same, the several acts of congress in relation thereto, and the laws and ordinances of the government from which it is alleged to have been derived."

The courts acted under this statute without any suggestion that the decree defining the grant and confirming the title of the patentee was not an exercise of judicial power.

In *Smith* v. *Adams,* 130 U. S. 167 (9 Sup. Ct. Rep. 566), an act of the Territory of Dakota, providing for the designation of county seats and making the determination of the election board subject to review in the courts, was sustained as a warranted delegation of judicial power.  Mr. Justice Field, speaking for the court, after holding that the designation of the county seat was not a matter itself for judicial cognizance, said:

"But when the law   *   *   *   left the designation *   *   *   to the voters of the county, and provided that the validity of the election could be contested by any competent elector   *   *   *   before the district court   *   *   *   and that the validity of the election should then be determined by the district court— the designation of a county seat under the law became the subject of judicial cognizance, a case or contro-

versy arising under such proceedings being taken to which the judicial power of the territory attaches."

He further says that by the terms "cases and controversies" are—

"intended the claims or contentions of litigants brought before the courts for adjudication by regular proceedings established for the protection or enforcement of rights, or the prevention, redress, or punishment of wrongs."

The power to be exercised by the court of claims under the provisions of the Federal Judicial Code (2 U. S. Compiled Statutes, § 1171 et seq.) is simply declaratory of the rights of the parties. No process may issue for its enforcement. The statute, however, declares:

"The judgment of said court or of the Supreme Court of the United States, to which an appeal shall lie, as in other cases, as to the amount due, shall be binding and conclusive upon the parties."

It further provides that the United States may bring action to recover the amount so found to be due. See, also, United States v. Nye, 21 How. (U. S.) 408; United States v. Huertas, 8 Pet. (U. S.) 475; United States v. Clarke, 8 Pet. (U. S.) 436.

Attention may be called to many Michigan statutes in which the action of the court pursuant thereto is merely declaratory and in which no enforceable judgment or decree is provided for. Workingmen's compensation act (2 Comp. Laws 1915, § 5423 et seq.), in which the action of the board is reviewed by this court and the award confirmed or the board directed how to proceed under the facts as found by it; 1 Comp. Laws 1915, § 2299 et seq., in which, on appeal from the action of the board of supervisors in refusing to allow a claim against a county, the circuit court may make an order directing the board how to proceed;

act providing for quieting title to real estate (3 Comp. Laws 1915, § 12371 *et seq.*), where a merely declaratory decree is provided for; act providing for condemnation of property by the State (1 Comp. Laws 1915, § 349 *et seq.*), and by certain corporations (1 Comp. Laws 1915, § 353 *et seq.*); act providing for appeal from action of commissioners on claims appointed by the probate court (3 Comp. Laws 1915, § 14145 *et seq.*); act permitting appeal from rate fixed by public utilities commission (Act No. 419, Public Acts of 1919); act requiring circuit judges to allow the accounts of expenses and fees of coroners in holding inquests (3 Comp. Laws 1915, § 15655); act providing that probate judges shall fix and determine the amount of inheritance or succession taxes (3 Comp. Laws 1915, § 14533).

The length of this opinion seems to forbid a reference to statutes of other States in addition to those referred to by Mr. Justice FELLOWS. We call attention to but one. Section 2352 of the Wisconsin statutes provides:

"When the validity of any marriage shall be denied or doubted by either of the parties, the other party may commence an action to affirm the marriage, and the judgment in such action shall declare such marriage valid or annul the same and be conclusive upon all persons concerned."

Proceedings under this act were had in *Kitzman* v. *Kitzman,* 167 Wis. 308 (166 N. W. 789), and the marriage there called in question was annulled.

It may be noted that "A bill to authorize the Federal courts of the United States to render declaratory judgments" is now pending before the committee on the judiciary of the United States senate. An interesting and instructive brief, prepared by Professor Borchard of Yale university in support of such legislation, has been filed with the committee. This and the able article written by Professor Sunderland of the University

of Michigan (American Law Review, March-April, 1920) are worthy of careful study by those interested in this class of legislation. The claim made by these writers that a declaration of reciprocal rights will in most cases suffice to insure obedience thereto would seem to be well founded. But, as pointed out by them, should the losing party prove recalcitrant, an enforceable judgment may easily be procured, the matters in dispute being *res adjudicata*.

The act in question is substantially a combination of Order No. 25, Rule 5 of the English Court Rules, adopted in 1883, and Order No. 54a, Rule 1 of such rules, adopted in 1893. As that country has no written constitution in which the powers of the several departments of government are limited and defined, the fact that its courts have proceeded under these rules for many years without any question having been raised as to the duties performed being non-judicial, has no controlling effect in this decision. It is, however, worthy of note that so many eminent English jurists have commended the wisdom of such procedure. We append a list of a few of the cases disposed of by those courts, an examination of which will indicate the class of cases likely to be presented under this statute. *Smith, Coney & Barrett* v. *Becker, Gray & Co.* (1916), 2 Ch. 86; *Cassel* v. *Inglis* (1916), 2 Ch. 211; *Williams, Hollins & Co.* v. *Paget* (1917), 86 L. J. Ch. 287; *H. Newsum & Co.* v. *Bradley* (1917), 86 L. J. K. B. 1238; *Cyclists' Touring Club* v. *Hopkinson* (1909), 101 L. T. 848; *Jenkins* v. *Price* (1907), 2 Ch. 229; *Guaranty Trust Co.* v. *Hannay & Co.* (1915), 2. K. B. 536.

The test to be applied, in my opinion, is, Will the judgment or decree of the court settle for all time the rights of the parties in the matter presented? A reading of the authorities cited by Mr. Justice FELLOWS will, I believe, reveal the fact that the determination of that question, as applied to the facts in each partic-

ular case, was decisive of the conclusion reached therein. I have been unable to find any case in which the refusal of the court to act was necessarily based on its inability to enforce obedience to its judgment or decree. While the opinions in many cases refer to such want of power, the language so employed will, I think, always be found to follow that in which the court finds a lack of finality in the judgment sought.

Herein lies the distinction between declaratory judgments and moot cases or advisory opinions. The declaratory judgment is a final one, forever binding on the parties on the issues presented; the decision of a moot case is mere *dictum* as no rights are affected thereby, while an advisory opinion is but an expression of the law as applied to certain facts not necessarily in dispute and can have no binding effect on any future litigation between interested parties.

An examination of the Michigan cases, cited but not quoted from, will show that in all but two of them purely moot questions were presented and in these two, where relief was sought by injunction to restrain the removal of personal property, it appeared that such removal had been had before the hearing.

We are not at this time called upon to specify the particular classes of cases which may be brought under this act. The English courts have many times refused to make declarations sought under their rules and have said that "such jurisdiction will be exercised with great caution." *Austen* v. *Collins* (1886), 54 L. T. 903. This court may, if it appears judicious to do so, under its general authority to make rules governing practice, point out the character of the matters to which the act shall apply.

By this act the State is attempting to afford its citizens relief from the uncertainty and insecurity attendant upon controversies over legal rights without requiring one of the parties interested to so invade the

rights asserted by the other as to entitle him to begin suit therefor. The judgment rendered operates as *res adjudicata* and binds the parties and their privies in the same manner as other final judgments. Should it become necessary, an enforceable judgment or decree may afterwards be obtained.

While of the opinion that the act is constitutional irrespective of the lack of power conferred on the court to enforce obedience to its judgment, order, or decree, it should not be overlooked that section 3 provides for the granting of such further relief. In other words, if the parties be governed by the determination of their legal rights as announced and each thereafter avoid interference with the ascertained rights of the other, well and good; if not, on application and notice the court may compel obedience thereto by any lawful process.

In my opinion, the duties imposed on the courts by this act are within their judicial power and in no way contravene any of the constitutional safeguards by which the several departments of government are surrounded.

Does the bill of complaint present a case within the purview of the act?

Section 1 of Act No. 361, Pub. Acts 1919, provides:

"No person, firm, corporation or municipality operating any street or interurban railway in the State of Michigan shall require any motorman or conductor on any street car or cars to work more than six days in any consecutive seven days of twenty-four hours each, except in case of any emergency which would result in serious loss, damage or impairment of service in which case, during the continuance of the emergency, the provisions requiring a six-day service may be suspended by the department head or proper subordinate in whose department the emergency shall have arisen."

The bill of complaint alleges, in substance, that the

plaintiff is an employee of the defendant railway company; that the business of the company necessitates the operation of its cars for seven days each week; that the defendant railway company in 1918 entered into an agreement with the intervening defendant, Division No. 836, Amalgamated Association of Street and Electric Railway Employees of America, wherein it agreed on a schedule of wages for its members when employed by the defendant railway company; that said agreement contained a provision that—

"Any and all disputes that may or do develop relating to the employment services of any employees, or violations or alleged violations of the company's orders, rules, and regulations, or relating to penalties applied by the company on account thereof"—

should be submitted to arbitration; that a controversy arose between the defendants as to whether or not under the provisions of Act No. 361, Pub. Acts 1919, the defendant railway company could lawfully permit its employees to work more than six out of any seven consecutive days, and the same was submitted to arbitration as provided for in said agreement; that the board of arbitration decided that the railway company could not lawfully do so; that by reason of such agreement and award of the board of arbitration the defendant company refuses to permit plaintiff and other employees who are not members of the defendant association to labor more than six out of any seven consecutive days, though they desire to do so and the defendant company would so employ them were it not for the construction placed on said act by said arbitration board and that plaintiff and other employees not members of the defendant association are "deprived of their right and privilege to employ their time as they desire" by reason thereof. The prayer of the bill is that the court make a binding declaration under the provisions of said Act No. 150—

"as to whether the said defendant (railway company) may lawfully permit plaintiff and its other employees who so desire to work more than six days in any one week without regard to the emergencies mentioned in said act" (No. 361).

The association, while not made a party defendant, has intervened and prosecutes this appeal from a decree declaring that under Act No. 361 it is not unlawful for the railway company to "permit and allow" the plaintiff or others of its employees to work more than six in any seven consecutive days.

As before stated, to entitle a party to ask for a declaration of rights under Act No. 150 it must appear that there is an actual, concrete controversy, a *bona fide* contest over asserted, existing legal rights between him and the defendant. The plaintiff has no legal right to demand employment from the railway company, nor is such company under any legal obligation to furnish him such employment. Under the decree rendered, should the company decline to employ plaintiff additional hours as requested by him, it could not be compelled to do so. The bill alleges that the only reason it does not is because of its agreement with the association and the award made pursuant thereto. The purpose of this proceeding is to secure a construction of Act No. 361 different from that placed upon it by the board in the arbitration proceedings had between the two defendants and thus obtain a modification of the terms of such agreement. The plaintiff, not being a party thereto, and having no legal rights dependent thereon, is not entitled to ask the court to make any declaration relative thereto.

The bill of complaint should be dismissed, with costs to the association, against plaintiff and the railway company.

CLARK, J., concurred with SHARPE, J.