# Order

Michigan Supreme Court
Lansing, Michigan

March 8, 2019

156018

VAN BUREN CHARTER TOWNSHIP,
          Plaintiff-Appellant,

v

VISTEON CORPORATION,
          Defendant-Appellee.

_____/

SC: 156018
COA: 331789
Wayne CC: 15-008778-CK

Bridget M. McCormack,
Chief Justice

David F. Viviano,
Chief Justice Pro Tem

Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh,
Justices

On October 9, 2018, the Court heard oral argument on the application for leave to appeal the May 16, 2017 judgment of the Court of Appeals. On order of the Court, the application is again considered, and it is DENIED, there being no majority in favor of granting leave to appeal or taking other action.

VIVIANO, J. (*dissenting*).

I respectfully dissent from the Court's order denying leave to appeal. I believe that the circuit court and the Court of Appeals erred in holding that plaintiff's declaratory judgment claim was not ripe. The Court of Appeals then proceeded to determine whether the parties had any present rights or obligations under their settlement agreement, even though such a determination was not necessary to the Court's ripeness analysis. Regardless, I believe the Court of Appeals further erred by concluding that the parties had no present rights or obligations under the settlement agreement. Accordingly, I would vacate Part (III)(A) of the Court of Appeals' opinion and remand to the trial court for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

In 2002, defendant Visteon Corporation entered into discussions with plaintiff Van Buren Charter Township about the possibility of locating its national headquarters in the Township. Specifically, defendant discussed building its headquarters in plaintiff's Local Development Finance Authority District (LDFA District). In 2003, plaintiff issued over $28 million in bonds to assist in the construction of defendant's headquarters, known as "Visteon Village." Plaintiff projected that property-tax revenue from the LDFA District would cover the costs of bond issuance.

By 2006, tax revenues from the LDFA District were lower than projected, so plaintiff issued new bonds in order to advance refund a portion of the original bonds. This allowed plaintiff more time to pay the principal on the original bonds. As a result, plaintiff was able to temporarily avoid a shortfall, i.e. not having sufficient funds to make the bond payments.

Then, in 2009, defendant filed for bankruptcy. Plaintiff filed an unsecured claim to recover unpaid amounts from earlier tax abatement agreements. In 2010, the parties entered into a settlement agreement, which provided that plaintiff would significantly lower Visteon Village's assessed taxable value. In exchange, defendant agreed to pay $2.2 million toward plaintiff's claimed amount and to not object to the remainder of plaintiff's unsecured claim.[1] The settlement agreement also contained the following provision, the meaning of which is now in dispute:

Section 3. Bond Payments

Visteon acknowledges that the Township assisted Visteon in the construction of the Village through the issuance by the Township of certain bonds supported by the full faith and credit of the Township, the proceeds of which were used to help construct the Village. To the extent that the property tax payments made by Visteon to the Township, including payments made by Visteon to the Township pursuant to Section 2.2, are inadequate to permit the Township to meet its payment obligations with respect to that portion of the bonds that were used to help fund the Village, Visteon hereby agrees to negotiate with the Township in good faith to determine the amount of the shortfall with respect to those bonds and make a non-tax payment, payment in-lieu-of tax, (PILOT) to the Township to assist the Township in making timely payments on the bonds.

Visteon emerged from bankruptcy later that year.

In 2013, plaintiff retained Public Financial Management (PFM) to conduct a cash-flow analysis to determine plaintiff's ability to pay on the bonds. In its report, PFM predicted that a shortfall ranging from $23.7 million to $36.4 million would occur sometime between 2017 and 2018.[2] Based on the report, plaintiff demanded that defendant enter into negotiations to determine defendant's payment obligations under the agreement with respect to the projected shortfall. Defendant met with plaintiff but argued that it had no obligation to negotiate until plaintiff experienced an actual shortfall and, even in the event of a shortfall, defendant argued that it may not owe plaintiff any amount under the contract.

Plaintiff filed suit, seeking both a declaratory judgment and damages for breach of contract. As to the declaratory judgment claim, plaintiff asked that the court "adjudicate the Parties' rights and obligations under the Settlement Agreement" and "enter a

---

[1] Plaintiff subsequently sold the unsecured claim for approximately $5.7 million.

[2] Because plaintiff used the payments made by defendant pursuant to the settlement agreement, as well as the funds obtained by the sale of the unsecured claim, to pay a portion of the interest on the bonds, the shortfall is now projected to occur in 2019.

declaration that Visteon is responsible for payment of any shortfall . . . ." As to the breach of contract claim, plaintiff asserted that defendant breached the agreement by "(i) refusing to negotiate the amount of the Bond debt service shortfall in good faith and (ii) failing to provide – or commit to provide – the Township with funds to pay for any shortfall with the Bond debt service payments." Plaintiff also claimed anticipatory repudiation, pointing to certain statements made by defendant indicating that defendant did not believe it owed plaintiff anything under the agreement.

Defendant filed a motion for summary disposition under MCR 2.116(C)(4) and (C)(8), arguing that plaintiff's claims were not ripe. Defendant argued that plaintiff's claims rested upon a hypothetical future shortfall; thus, no actual controversy presently existed. The trial court agreed, granting summary disposition in defendant's favor. On the record, the trial court explained its reasoning as follows:

> The Court agrees with the defendant that this case epitomizes why the ripeness doctrine exists, mainly to prevent courts from becoming prematurely embroiled in complex disputes involving hypothetical and contingent facts when, especially when the projected [shortfall] is estimated three years from now.

The Court of Appeals affirmed in a published opinion. In finding plaintiff's declaratory judgment claim unripe, the court explained:

> According to the plain language of the contract, defendant is obligated to "negotiate with [plaintiff] in good faith to determine the amount of the shortfall," but only "[t]o the extent that the property tax payments made by [defendant]" are "inadequate to permit [plaintiff] to meet its payment obligations" and only "with respect to that portion of the bonds that were used to help fund the Village." Thereafter, defendant is obligated to "make a non-tax payment" in order to "assist" plaintiff in making "timely" payments on those bonds. In each case, the tense of the verb is present, not future. No reasonable person reading this provision could find it ambiguous or conclude that defendant is obligated to engage in negotiations before the shortfall. Indeed, the contract admits of but one interpretation, in which the occurrence of the shortfall is a condition precedent to defendant's obligation to perform, and defendant is not obligated to do anything until after plaintiff has experienced a shortfall. In fact, defendant is not obligated to perform until after two conditions have been met: (1) a shortfall has occurred, and (2) property taxes paid by defendant are inadequate for plaintiff to pay that portion of the bonds that was used to fund the Village. This second condition cannot be met until *after* the shortfall has occurred and the parties have determined the amount due.

Contrary to plaintiff's assertion on appeal, the requirement that defendant negotiate in good faith to "determine the amount of the shortfall" does not force the implication that defendant must be required to negotiate before the occurrence of a shortfall. Plaintiff forgets that the provision contains qualifying language, requiring defendant to negotiate in good faith to determine the amount of the shortfall only "with respect to those bonds" that were "supported by the full faith and credit of [plaintiff], the proceeds of which were used to help construct the Village." Defendant is therefore clearly obligated to engage in negotiations once a shortfall occurs, to determine which part of the shortfall can be attributed to bonds it is obligated to assist plaintiff to pay.[3]

Similarly, regarding plaintiff's breach of contract claim, the Court of Appeals found the claim unripe because "defendant could not have breached its contract by failing to perform before the time of performance has even arrived."[4] Further, the Court of Appeals explained that, "at least at this time, plaintiff's alleged damages are conjectural, speculative, and clearly 'dependent upon the chances of business or other contingencies.' "[5]

Following plaintiff's appeal to our Court, we ordered oral argument on the application, directing the parties to address

whether the Court of Appeals: (1) properly determined that a declaratory judgment was not ripe under MCR 2.605; and (2) properly interpreted the contract to determine that "defendant is not obligated to perform [under the contract] until . . . a shortfall has occurred, and . . . property taxes paid by defendant are inadequate for plaintiff to pay that portion of the bonds that was used to fund the Village."[6]

## II. ANALYSIS

## A. RIPENESS OF PLAINTIFF'S DECLARATORY JUDGMENT CLAIM

Declaratory judgment in Michigan is governed by MCR 2.605, which provides in relevant part, "In a case of actual controversy within its jurisdiction, a Michigan court of record may declare the rights and other legal relations of an interested party seeking a

---

[3] *Van Buren Charter Twp v Visteon Corp*, 319 Mich App 538, 548-549 (2016).

[4] *Id*. at 554.

[5] *Id*. at 552, quoting *Doe v Henry Ford Health Sys*, 308 Mich App 592, 601 (2014).

[6] *Van Buren Charter Twp v Visteon Corp*, 501 Mich 1069 (2018).

declaratory judgment, whether or not other relief is or could be sought or granted."[7] Regarding the purpose of the declaratory judgment rule, our Court has stated, "The declaratory judgment rule was intended and has been liberally construed to provide a broad, flexible remedy with a view to making the courts more accessible to the people."[8] "One great purpose is to enable parties to have their differences authoritatively settled in advance of any claimed invasion of rights, that they may guide their actions accordingly and often may be able to keep them within lawful bounds . . . ."[9] As noted by one scholar, "[p]robably one of the most useful functions of the declaratory judgment in preventing litigation lies in the fact that it enables parties to obtain in case of doubt and in advance of the necessity of acting upon their own interpretation of their obligations, with the resulting invitation of a lawsuit, an authoritative judicial interpretation of their mutual rights, powers, duties, etc., under written instruments."[10]

That a declaratory judgment must address an "actual controversy" is central to the legitimacy of the device. In *Washington-Detroit Theatre Co v Moore*, our Court considered the Legislature's second attempt to enact a declaratory judgment act that satisfied constitutional standards.[11] We had found the prior declaratory judgment act unconstitutional, explaining that "it requires that the time of the court shall be taken, not in the determination of actual controversies where rights have been invaded and wrongs have been done, but in the giving of advice to all who may seek it."[12] The new act, however, conditioned that a declaratory judgment was only available in " 'cases of actual

---

[7] MCR 2.605(A)(1).

[8] *Shavers v Attorney General*, 402 Mich 554, 588 (1978).

[9] *Merkel v Long*, 368 Mich 1, 13 (1962), quoting *Sigal v Wise*, 114 Conn 297, 301-302 (1932).

[10] Borchard, *The Declaratory Judgment—A Needed Procedural Reform* (Washington, DC: United States Government Printing Office, 1919), p 45. See also 11 Williston on Contracts § 30:2 (4th ed), p 36 ("A frequently employed means of demonstrating in an authoritative manner the intent of the parties to a contract, either for the purpose of establishing rights or the nonexistence of liabilities, is the petition for declaratory judgment.").

[11] *Washington-Detroit Theatre Co v Moore*, 249 Mich 673 (1930). This act, 1929 PA 36, was codified into the Judicature Act and governed declaratory judgment actions in Michigan until it was repealed by the Revised Judicature Act, 1961 PA 236. In the same period, our Court adopted a rule governing declaratory judgment actions, GCR 1963, 521, now MCR 2.605. Thus, declaratory judgment actions in Michigan are no longer governed by statute, but instead are governed by court rule.

[12] *Anway v Grand Rapid R Co*, 211 Mich 592, 606 (1920).

controversies' " and was therefore constitutional.[13]

In order to satisfy the "actual controversy" requirement, a plaintiff's claim must be justiciable.[14] Thus, the "actual controversy" requirement contained in the court rule incorporates the concepts of standing, mootness, and ripeness.[15] Like in an ordinary action, ripeness in the declaratory judgment context requires a present legal controversy, not one that is merely hypothetical or anticipated in the future.[16] Unlike an ordinary action, however, in a declaratory action "a court is not precluded from reaching issues before actual injuries or losses have occurred."[17] Indeed, "the basic purpose of a declaratory judgment act is to provide for declaratory judgments without awaiting a breach of existing rights."[18]

---

[13] *Washington-Detroit Theatre Co*, 249 Mich at 676, quoting 1929 PA 36. *Anway* and *Washington-Detroit Theatre Co* have been widely cited by federal courts and our sister state courts in deciding the constitutionality of declaratory judgment acts within their jurisdictions.

[14] See *Shavers*, 402 Mich at 589 ("[A] plaintiff must allege and prove an actual *justiciable* controversy.").

[15] See *Associated Builders and Contractors v Dep't of Consumer & Industry Servs Dir*, 472 Mich 117, 125 (2005) ("Moreover, the rule requires that there be 'a case of actual controversy' and that a party seeking a declaratory judgment be an 'interested party,' thereby incorporating traditional restrictions on justiciability such as standing, ripeness, and mootness."), overruled on other grounds by *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349 (2010).

[16] Borchard, Declaratory Judgments (1934), p 40 ("When the complaint on these tests is considered premature, the dismissal may be explained by any one of a series of labels, *e.g.*, that there is as yet no 'controversy,' that the issue is hypothetical, that the result would be only an advisory opinion, etc."); 26 CJS, Declaratory Judgment, § 28, p 66 ("[A] controversy is justiciable, such that a declaratory judgment action may be maintained, when present legal rights are affected, not when a controversy is merely anticipated.").

[17] *Shavers*, 402 Mich at 589. See also 26 CJS, Declaratory Judgment, § 28, p 67 ("A party should not be forced to wait until the event giving rise to the claim occurs before a court may determine the party's rights and obligations in a declaratory judgment action.").

[18] *Id*. See also 9A Michigan Pleading & Practice (2d ed), § 69:8, p 390-391 ("[A]n actual present controversy, justifying a declaratory judgment, is present where uncertainties and controversies arise between interested parties about what their respective rights will be when those rights accrue or become vested, and it is necessary to have those rights determined at the present time to avoid needless hazards or possible losses in the future. In these situations, courts are not precluded from reaching issues before actual injuries or

In this case, plaintiff's request for a declaratory judgment involves a present legal controversy—it is a dispute over the parties' present rights and obligations under Section 3 of the 2010 settlement agreement. In particular, plaintiff argues that defendant has a present duty under the settlement agreement to negotiate with plaintiff to determine the amount of the projected shortfall and to make a payment to the township to assist it in making timely payments on the bonds; and defendant claims that it has no present duty under the agreement. Thus, even if plaintiff has not yet shown an injury, plaintiff has presented an "actual controversy" within the meaning of MCR 2.605.[19]

It may be true, as defendant argues, that determining the exact amount of defendant's liability is not possible at this time.[20] This is not relevant, however, to plaintiff's declaratory judgment claim. Plaintiff's declaratory judgment claim does not seek a specific amount of damages, but instead seeks a declaration of the parties' present obligations under the

losses have occurred.").

[19] Even if the Court of Appeals was correct that defendant has no obligations under the settlement agreement until after a shortfall occurs, and that therefore plaintiff's claim only involved future rights and obligations, its conclusion that plaintiff's claim was unripe would still be on shaky ground. It is true that, generally, a declaratory judgment must address "the existing law on an existing state of facts." Borchard, Declaratory Judgments, p 40. But this is not an inflexible rule—a declaratory judgment may address parties' rights under future, or even contingent, events or circumstances. *Id*. at 44 ("[C]ourts have been less inclined to refuse declarations where they were convinced that the future event was certain or practically certain to occur, and that a useful purpose could be served, whereas theretofore they were disposed to ask for more accrued facts as a condition of adjudication."). Indeed, as we have previously recognized, " 'to carry out the purposes intended to be served by [declaratory] judgments, it is sometimes necessary to determine rights which will arise or become complete only in the contingency of some future happening.' " *Merkel*, 368 Mich at 13, quoting *Sigal*, 114 Conn at 301-302. "Courts continually declare rights which have not become fixed under an existing state of facts, but are prospective only; they may not, however, be so remote and speculative as to be hypothetical and abstract." *Merkel*, 368 Mich at 13, quoting Borchard, Declaratory Judgments (2d ed), pp 422-424. Thus, the Court of Appeals erred by assuming that, if plaintiff's claim involved future rights and obligations, it could not be ripe.

[20] See Appellee's Answer Brief at 27 ("But even if the Township is right that a shortfall in some amount is "certain" to occur at some point in the future, when that might happen is simply unknown. More importantly, there is no way to know what the amount of any shortfall might be.").

settlement agreement.[21] To the extent that the Court of Appeals found plaintiff's declaratory judgment claim unripe because the Court could not determine the exact amount of defendant's liability at this time, the Court of Appeals erred in this regard as well.[22]

For these reasons, plaintiff's claim as to the parties' rights and obligations under the agreement is ripe for adjudication.

## B.  THE COURT OF APPEALS' INTERPRETATION OF THE SETTLEMENT AGREEMENT

Had the Court of Appeals merely held that plaintiff's claim was not ripe, my analysis would end here. However, the Court of Appeals proceeded to partially determine the parties' rights and obligations under the settlement agreement, stating as follows:

> [T]he contract admits of but one interpretation, in which the occurrence of the shortfall is a condition precedent to defendant's obligation to perform, and defendant is not obligated to do anything until after plaintiff has experienced a shortfall. In fact, defendant is not obligated to perform until after two conditions have been met: (1) a shortfall has occurred, and (2) property taxes paid by defendant are inadequate for plaintiff to pay that portion of the bonds that was used to fund the Village. This second condition cannot be met until *after* the shortfall has occurred and the parties have determined the amount due.[23]

---

[21] It is true that plaintiff's complaint sought a declaration that defendant was obligated to pay the full amount of any shortfall. See Plaintiff's Complaint at 14-15 ("WHEREFORE, the Township seeks a declaratory judgment pursuant to MCR 2.605 to adjudicate the Parties' rights and obligations under the Settlement Agreement, and the Township respectfully requests the Court enter a declaration that Visteon is responsible for payment of any shortfall in the Bond debt service payments identified in this Complaint, as well as any other relief as justice and fairness require."). Even this, however, is not a request for the court to determine the exact amount of a shortfall. Instead, plaintiff is seeking an interpretation of the settlement agreement that would require defendant to pay the full amount of the shortfall, whatever that amount might be.

[22] While the impossibility of determining plaintiff's actual damages at this time does not render plaintiff's declaratory judgment claim unripe, it does affect plaintiff's breach of contract claim, which requires plaintiff to make a showing as to damages. Accordingly, I would not disturb the Court of Appeals' holding as to plaintiff's breach of contract claim.

[23] *Van Buren*, 319 Mich App at 548.

In so holding, the Court of Appeals essentially entered a partial declaratory judgment determining when defendant's obligations under the contract are triggered. Having concluded that plaintiff's declaratory judgment claim is ripe for adjudication, I now believe it necessary to address the Court of Appeals' determination that defendant's contractual duties are not triggered until a shortfall has occurred.

In concluding that defendant has no obligation under the contract until after a shortfall has occurred, the Court of Appeals relied primarily on the verb tense used in the settlement agreement, explaining:

> [T]he tense of the verb[s] is present, not future. No reasonable person reading this provision could find it ambiguous or conclude that defendant is obligated to engage in negotiations before the shortfall. Indeed, the contract admits of but one interpretation, in which the occurrence of the shortfall is a condition precedent to defendant's obligation to perform, and defendant is not obligated to do anything until after plaintiff has experienced a shortfall.[24]

We have relied on verb tense in the past when interpreting legal texts.[25] We have also recognized, however, that verb tense is not always determinative and must be considered in the context of the surrounding text.[26] Accordingly, a close inspection of the verbs contained within the agreement is necessary to determine whether the Court of Appeals is correct that the verb tense is indicative of the timing of defendant's obligations. The agreement uses the following verbs: "To the extent that the property tax payments . . . *are* inadequate *to permit* the Township *to meet* its payment obligations . . . , Visteon hereby *agrees to negotiate* with the Township in good faith *to determine* the amount of the shortfall with respect to those bonds and *make* a non-tax payment . . . to the Township *to assist* the Township in making timely payments on the bonds." (Emphasis added.)[27] With two exceptions—"are" and "agrees"—each of the verbs identified above is in the infinitive form.[28] Unlike finite verbs, infinitives primarily

---

[24] *Id.*

[25] See, e.g., *City of Coldwater v Consumers Energy Co*, 500 Mich 158, 176 (2017) (noting that the phrase "already receiving" within MCL 124.3(2) is a present participle and that "[t]he verb tense is meaningful here because it indicates a present-tense lens").

[26] See *Rock v Crocker*, 499 Mich 247, 263 (2016) (recognizing that "the Legislature deviated from the general rules of grammar in MCL 600.2169(1)(a) by using the present tense when referring to an event that had already occurred").

[27] "Making" is a gerund in this context, which functions as a noun. See *The Chicago Manual of Style* (16th ed), p 233.

[28] *Id.* at 232 ("An infinitive verb, also called the verb's root or stem, is a verb that in its

function as nouns, adjectives, or adverbs,[29] and are widely considered to have no tense.[30] Additionally, when an infinitive is paired with a present tense finite verb, such as "agrees to negotiate," the result can indicate either present or future action.[31] Thus, while "agrees" is in present tense, because it is paired with the infinitive it may refer to either present or future obligations.

We are left, then, to determine whether the agreement's single remaining use of present tense in the noninfinitive form—"are inadequate"—is sufficient to conclude that defendant's obligations under the agreement come into effect at the time of the shortfall. The Court of Appeals' interpretation of the agreement assumed that the property tax payments will become "inadequate" at the time that the shortfall occurs. This is not the only possible reading, however. The agreement may, alternatively, consider the payments "inadequate" when a shortfall is projected to occur. Under this reading, the tax payments are *presently* inadequate because they will not allow plaintiff to continue making timely payments. Because both of these readings are grammatically acceptable, I do not think the use of present tense for "are inadequate" necessarily leads to the Court of Appeals' conclusion.

Accordingly, we must look to the remainder of the provision to determine the appropriate interpretation. As plaintiff points out, the agreement requires that defendant "make a non-tax payment . . . to assist [plaintiff] in making timely payments." "Timely" is defined as "coming early or at the right time."[32] Suffice it to say that, if defendant is

---

principal uninflected form may be preceded by *to* {to dance} {to dive}.").

[29] See Vitto, *Grammar by Diagram: Understanding English Grammar Through Traditional Sentence Diagramming* (2d ed), p 219.

[30] See Garner, *Garner's Modern English Usage* (4th ed), p 853 ("An infinitive is the tenseless form of a verb preceded by *to*, such as *to dismiss* or *to modify*."). But see Stowell, *The Tense of Infinitives*, 13 Linguistic Inquiry 561 (1982) (discussing infinitive tenses). Moreover, the infinitives here clearly serve functions unrelated to the timing of defendant's obligations. "[T]o permit," "to determine," and "to assist" all function as adverbs, denoting the purpose of defendant's agreed-to actions. See Vitto, pp 222-224. Similarly, "to meet," "to negotiate," and "[to] make" are each nouns, functioning as the direct objects of "permit" and "agrees." *Id*. at 221. Thus, each of the infinitives in the agreement is functioning not as a verb, whose tense could indicate the timing of defendant's obligations, but instead as either an adverb or a noun.

[31] See Curme, *College English Grammar* (Richmond: Johnson Publishing Company, 1925), p 301 ("Here the present tense indicates time contemporaneous or future with reference to that of the principal verb: I wish *to go* at once. I intend *to write* a line or two to her soon. Yesterday I intended *to write* a line to her, but forgot it.").

[32] *Merriam-Webster's Collegiate Dictionary* (11th ed).

not obligated to even begin negotiations until after a shortfall occurs, then plaintiff's payments to the bond holders will not be "coming early or at the right time." The Court of Appeals sweeps this concern aside, concluding that the agreement is "perhaps inartfully worded."[33] However, I believe the meaning is clear: defendant is required to "make a non-tax payment . . . to [plaintiff] to assist [plaintiff] in making timely payments"—i.e., to make whatever payment is owed, if any, before the shortfall occurs.

The agreement also requires that defendant "negotiate with the Township in good faith to determine the amount of the shortfall with respect to those bonds [that were used to help fund the Village]." Plaintiff argues that this clause requires defendant to negotiate with plaintiff before a projected shortfall to estimate the amount of the shortfall. Defendant, on the other hand, argues that this clause only requires defendant to negotiate with plaintiff at the time of the shortfall to determine the proportion of the shortfall that correlates with the bonds that were issued to assist with the construction of Visteon Village. The word "amount," however, refers not to a proportion, but to a "quantity."[34] Thus, under the agreement, the parties must negotiate the "quantity" of the shortfall, not merely the percentage of the shortfall correlating to the relevant bonds. Because the agreement requires the parties to negotiate a quantity, I believe the agreement contemplates negotiations before a shortfall has occurred. Otherwise, as plaintiff argues, the parties would have nothing to negotiate—the amount would already be determined.

For the reasons stated above, I believe the parties' agreement clearly contemplates that defendant has an obligation prior to the occurrence of a shortfall: (1) to negotiate with plaintiff to determine the amount of the projected shortfall, and (2) to make whatever payment it may owe to plaintiff to assist it in making timely payments on the bonds. Determining the nature and extent of defendant's obligations in the first instance is a task properly left to the trial court.

## III. CONCLUSION

I believe the Court of Appeals erred in its published opinion by finding plaintiff's

---

[33] *Van Buren Charter Twp*, 319 Mich App at 547.

[34] See *Merriam-Webster's Collegiate Dictionary* (defining "amount" as "the total number or quantity" and "the quantity at hand or under consideration").

declaratory judgment action unripe and in its determination that the parties had no present rights or obligations under the settlement agreement. Accordingly, I would vacate Part (III)(A) of the Court of Appeals' opinion and remand to the trial court for further proceedings.

MCCORMACK, C.J., joins the statement of VIVIANO, J.

BERNSTEIN, J., would reverse the judgment of the Court of Appeals.

CAVANAGH, J., did not participate in the disposition of this case because the Court considered it before she assumed office.





I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

March 8, 2019

Clerk