# Order

Michigan Supreme Court
Lansing, Michigan

September 11, 2020

161671(76)(77)(78)

Bridget M. McCormack,
Chief Justice

David F. Viviano,
Chief Justice Pro Tem

Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh,
Justices

LEAGUE OF WOMEN VOTERS OF MICHIGAN,
DEBORAH BUNKLEY, ELIZABETH CUSHMAN,
and SUSAN SMITH,
                Plaintiffs-Appellants,

v

SECRETARY OF STATE,
                Defendant-Appellee.

SC: 161671
COA: 353654

_____/

On order of the Court, the motion for immediate consideration and the motion to file supplemental authority are GRANTED. The motion for reconsideration of this Court's July 31, 2020 order is considered, and it is DENIED, because we are not persuaded that reconsideration of our previous order is warranted. MCR 7.311(G).

VIVIANO, J. (*concurring*).

Plaintiffs' central claim in this case is that the statutory deadline requiring absentee ballots to be received by 8:00 p.m. on election day, MCL 168.764a, is unconstitutional under Const 1963, art 2, § 4. I voted to deny the application for leave to appeal in this matter previously and concur in the Court's order denying plaintiff's motion for reconsideration. I did so (and do so) because, while I agree the Court of Appeals should have focused first on the Constitution's plain language (and not the ballot summary), no clear errors were apparent in the majority's analysis of the constitutional text.[1]

I write separately to highlight another reason why this Court should not exercise its discretionary power to grant the application: this lawsuit appears to be a friendly scrimmage brought to obtain a binding result that both sides desire. Nearly from the start, the defendant Secretary of State has agreed with plaintiffs that the deadline must be struck down as unconstitutional.[2] In reaching a different conclusion, the Court of

---

[1] Also important is that the ruling below did not change the status quo: the statute was enforceable before and remains so now. Moreover, nothing precludes us from examining its constitutionality in an appropriate future case—one without this case's serious problems, which I describe below.

[2] The parties disagree on plaintiffs' alternative constitutional arguments against the statute and plaintiffs' claims that their constitutional rights to vote and vote by absentee

Appeals rejected the parties' attempt to "affect the entire state by means of an agreement as to the proper interpretation of . . . the Constitution as will be applied generally." *League of Women Voters of Mich*, ___ Mich App ___, ___ (2020) (Docket No. 353654), slip op at 4. Apparently disappointed by her nominal victory below, the Secretary of State has consented to plaintiffs' efforts to have this Court rule against her and declare unconstitutional the statute she would normally be charged with defending. The Secretary of State did not file a response to plaintiffs' application for leave in this Court but instead agreed to plaintiffs' motion for immediate consideration. And now she has given plaintiffs' motion for reconsideration her blessing. Indeed, the motion purports to speak for both sides of this conjured dispute.

This is not the way the judiciary works. In our adversary system, the parties' competing interests lead to arguments that sharpen the issues so that courts will "not sit as self-directed boards of legal inquiry and research . . . ." *Carducci v Regan*, 230 US App DC 80, 86 (1983) (Scalia, J.); see also Fuller, *The Adversary System*, in Berman, ed, *Talks on American Law* (New York: Vintage Books, 1971), p 35 ("[B]efore a judge can gauge the full force of an argument, it must be presented to him with partisan zeal by one not subject to the restraints of judicial office. The judge cannot know how strong an argument is until he has heard it from the lips of one who has dedicated all the powers of his mind to its formulation."). Our role, therefore, is to act as neutral arbiters of real disputes brought by adverse parties. *Carducci*, 230 US App DC at 86.

Courts cannot fulfill this role when the parties agree on the merits to such an extent that no honest dispute exists. Cf. *United States v Windsor*, 570 US 744, 782 (2013) (Scalia, J., dissenting) ("We have never before agreed to speak—to 'say what the law is'—where there is no controversy before us."). Such agreements among parties have long been condemned by the United States Supreme Court:

> [A]ny attempt, by a mere colorable dispute, to obtain the opinion of the court upon a question of law which a party desires to know for his own interest or his own purposes, when there is no real and substantial controversy between those who appear as adverse parties to the suit, is an abuse which courts of justice have always reprehended, and treated as a punishable contempt of court. [*Lord v Veazie*, 49 US (8 How) 251, 255 (1850).]

This is particularly true when the constitutional validity of a statute is at stake:

> Whenever, in pursuance of an honest and actual antagonistic assertion of rights by one individual against another, there is presented a question involving the validity of any act of any legislature, State or Federal, and the

---

ballot are violated by local clerks who fail to immediately process absentee-ballot applications and by requiring absentee voters to pay postage to mail the ballots.

decision necessarily rests on the competency of the legislature to so enact, the court must . . . determine whether the act be constitutional or not; but such an exercise of power is the ultimate and supreme function of courts. It is legitimate only in the last resort, and as a necessity in the determination of real, earnest and vital controversy between individuals. It never was the thought that, by means of a friendly suit, a party beaten in the legislature could transfer to the courts an inquiry as to the constitutionality of the legislative act. [*Chicago & Grand Trunk R Co v Wellman*, 143 US 339, 345 (1892).]

The Supreme Court has accordingly declared that no controversy exists to adjudicate when both sides seek the same result. See *Moore v Charlotte-Mecklenburg Bd of Ed*, 402 US 47, 47-48 (1971) (dismissing case when both sides argued that a law was constitutional and should be upheld). And the Court has dismissed individual claims and vacated judgments on such claims when no controversy existed as to those claims, even in situations like the present case, where the parties have adequately disputed other issues. See *Webster v Reproductive Health Servs*, 492 US 490, 512-513 (1989) (dismissing one of several claims because no controversy existed regarding it when appellees abandoned their argument); *Williams v Zbaraz*, 448 US 358, 367 (1980) (vacating the portion of a judgment regarding a constitutional claim that the district court had no jurisdiction to decide because of the lack of adverse contentions and controversy, but reaching other issues in the case).

We have likewise endorsed the proposition that the parties' "controversy must be real and not *pro forma* . . . . Courts cannot be used for the purpose of deciding even real questions in *pro forma* suits," or else "the most complicated and difficult questions of law, and the constitutionality of statutes might be settled by the court upon such *pro forma* proceedings, when no real controversy or adverse interests exist, and no proper examination of the important questions is made by counsel or the court." *Anway v Grand Rapids R Co*, 211 Mich 592, 612 (1920) (quotation marks and citation omitted). Accordingly, we are "limited to determining rights of persons or of property, which are *actually controverted in the particular case* before" us. *Id*. at 615 (quotation marks and citation omitted; emphasis added). "The judicial power . . . is the right to determine actual controversies arising between *adverse* litigants . . . ." *Id*. at 616 (quotation marks and citation omitted; emphasis added). Thus, for example, to obtain a declaratory judgment on the constitutionality of a statute—which is essentially what plaintiffs seek here—the parties must have "adverse interests" forming an actual controversy. See *Assoc Builders & Contractors v Dir of Consumer & Indus Servs*, 472 Mich 117, 126 (2005), overruled on other grounds by *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 372 n 20 (2010).

We do not, therefore, simply scan the horizon for important legal issues to opine on—we address such issues only as they arise in the genuine controversies between adverse parties that come before us. On the central legal issue in this case, the parties are companions, not opponents. At best, this cooperation deprives courts of the adversarial

back-and-forth required to fully and fairly decide legal issues big and small. At worst, the agreement might undermine the courts' power to hear the constitutional challenge. In an appropriate future case, the Court may need to consider whether these types of friendly lawsuits or claims must be dismissed for lack of jurisdiction. But we need not decide that issue here. Instead, it is sufficient to note that these concerns provide additional justification for our decision to deny leave in this case and reject the present motion for reconsideration.

These concerns flow from the executive branch's refusal to defend a statute. Executive nondefense of legislation presents problems that stretch beyond the legal points mentioned above. See Meltzer, *Executive Defense of Congressional Acts*, 61 Duke L J 1183, 1186-1187 (2012) (advocating the traditional practice of executive defense of statutes for a host of reasons: the difference between the legislative and executive branches, "institutional continuity within the executive branch," and the likelihood that normalizing such nondefense will cause it to become pervasive and further erode perceptions of judicial restraint due to political polarization and the "temptation to equate what is misguided or immoral with what is unconstitutional"). At the very least, courts should be wary of encouraging this practice without having structures in place to accommodate the dislocations it causes in what should be adversarial litigation. Cf. Shaw, *Constitutional Nondefense in the States*, 114 Colum L Rev 213, 247-256 (2014) (noting various options adopted by other jurisdictions, such as enacting statutes that require the executive to notify the legislature when it intends not to defend a law, providing for legislative standing, or selecting an alternative executive branch actor (such as the governor) or outside counsel to defend the statute).

Michigan lacks most such tools. The Attorney General does have the statutory authority to intervene to protect any right or interest of the state. See MCL 14.101; MCL 14.28. But the Attorney General represents the Secretary of State here, and she did not attempt to intervene in opposition to her client. Defending both sides of an actual case might raise ethical concerns. See *Attorney General v Pub Serv Comm*, 243 Mich App 487, 518 (2000) (holding that "pursuant to the rules of professional conduct, if the Attorney General chooses to stand in opposition to a state agency or department as an actual party litigant and yet simultaneously attempts to represent that state agency in the litigation, such dual representation creates a conflict of interest that must be addressed and rectified") (emphasis omitted); but see *League of Women Voters of Mich v Secretary of State*, __Mich App__, ___ (2020) (Docket Nos. 350938 and 351073); slip op at 4 n 1 (BOONSTRA, J., concurring in part and dissenting in part) (noting the Legislature's contention that the Attorney General historically set up conflict walls when arguing both sides of a case). Even so, we have no history of forcing the Attorney General to argue both sides in an actual case when she has already staked out a position. In her dissent, the Chief Justice cites two orders in which we directed the Attorney General to brief the opposing positions, but both orders involved requests for advisory opinions. See *post* at 2, citing *In re House of Representatives Request for Advisory Opinion Regarding Constitutionality of 2018 PA 368 & 369*, 924 NW2d 882 (2019), and *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 474 Mich 1230 (2006). By

definition, they involve no case or controversy or even any parties; we can hear these matters only because the Constitution explicitly allows it. Const 1963, art 3, § 8.[3]

The Chief Justice also suggests that, like the United States Supreme Court, we could begin appointing amici curiae to file briefs defending the constitutionality of undefended statutes. It is not clear to me, however, that the Supreme Court has ever employed amici in a case like the present one, where the parties have agreed on the merits almost from the beginning. Rather, these appointments appear to occur when the government confesses error or changes its view before the Supreme Court, when the Court of Appeals below or the Supreme Court raises an issue sua sponte, or when the respondent fails to appear before the Supreme Court. See Note, *Should the Supreme Court Stop Inviting Amici Curiae to Defend Abandoned Lower Court Decisions?*, 63 Stan L Rev 907, 920-939 (2011).

In my view, this proposed solution places courts well outside their lane as passive tribunals. It departs from the principle that parties, and not the courts, choose the issues to be resolved. *Id*. at 943-944. It further risks tarnishing the courts' neutrality by forcing judges to decide which cases merit an amicus and which do not. The United States Supreme Court's practice sheds little light on this point. For example, in roughly the last quarter of the twentieth century, when the government confessed error, the Supreme Court sometimes denied certiorari, sometimes vacated the decision below and remanded, and sometimes appointed amici. *Id*. at 948. No official or discernable principles govern why some cases get singled out for appointment of amici and others do not. Cf. Shaw, *Friends of the Court: Evaluating the Supreme Court's Amicus Invitations*, 101 Cornell L Rev 1533, 1535 (2016) ("The Court keeps no official records of such invitations, and its rules do not reference them. Similarly, there is no official guidance on when the Court will invite such an amicus, whom it will invite, how it makes its selections, or the precise nature of the amicus's mandate.") (citations omitted). And, as a practical matter, who will pay for the added cost of court-appointed amici? Even if these concerns could be waved aside, appointing an amicus at the appellate level will do nothing to develop the factual record in the trial court if, as here, the parties were never adverse regarding the issue at stake. See *Executive Defense*, 61 Duke L J at 1210 ("In many cases . . . a court's judgment about constitutionality might depend on the evidentiary record assembled in the district court concerning the strength or weakness of the asserted government interests."). Thus, the problems presented by executive nondefense of a statute would only be exacerbated if the Court appointed amici to create the semblance of an adversary proceeding where one never existed.

We should think long and hard before we go out of our way to adopt any

---

[3] A majority of this Court has recently directed the Attorney General to argue both sides of a question when the Attorney General changed her view of the proper interpretation of a statute before our Court. See *Maples v Michigan*, ___ Mich ___ (2020) (Docket No. 160740).

unprecedented measures to facilitate executive nondefense of statutes. I fear that the pervasiveness of this practice poses serious dangers to our system of government, and our accommodation of it will only exacerbate these dangers. Courts require real disputes, and thus the better course from our vantage is for the executive branch to enforce and defend statutes—even when it disagrees with them or thinks they are unconstitutional. Cf. *Executive Defense*, 61 Duke L J at 1235 ("I have tried to set forth a range of reasons why the executive branch should enforce and defend statutes such as Don't Ask, Don't Tell and [the Defense of Marriage Act]—even when it views them as wrongheaded, discriminatory, and indeed as shameful denials of equal protection."). But even aside from my larger concerns with the practice, there is absolutely no warrant to appoint amici in this case since the parties have been joint adventurers nearly from the start. For all these reasons, I concur in the denial of the motion for reconsideration.

MCCORMACK, C.J. (*dissenting*).

I would grant reconsideration, grant the plaintiffs' application for leave to appeal, and order expedited consideration. I agreed with the reasons identified in Justice BERNSTEIN's statement dissenting from our previous order denying leave to appeal, *League of Women Voters of Mich v Secretary of State*, ___ Mich ___ (July 31, 2020, Docket No. 160907-8), about why this case deserved our consideration. Now there is more.

The plaintiffs present a letter from the General Counsel and Executive Vice President of the United States Postal Service (USPS) stating that Michigan's deadline for receiving absentee ballots is "incompatible" and "incongruous" with the USPS's delivery standards, creating a risk that ballots requested close to the election will not be returned in time to be counted; the letter encourages election officials to keep those standards in mind when communicating with voters about how to successfully vote by mail. The risk of late-arriving ballots is heightened by the USPS's recent decommissioning of mail sorting machines and other cost-cutting measures likely to lead to further delays in mail delivery highlighted in news reports the plaintiffs submitted. Finally, the plaintiffs present evidence that is not merely hypothetical—they point to the volume of absentee ballots not received until after the August 2020 primary election that went uncounted, a volume that had the potential to be outcome-determinative in at least one election.

The potential deprivation of thousands of Michiganders' fundamental right to vote deserves our attention. In my view, with this new evidence, the plaintiffs have demonstrated that our prior order denying leave to appeal was based on a "palpable error." MCR 2.119(F)(3); see also MCR 7.311(G). Moreover, they have shown that their application involves "a substantial question about the validity of a legislative act," an issue that "has significant public interest and . . . is one by or against the state or one of its agencies," and "a legal principle of major significance to the state's jurisprudence," MCR 7.305(B)(1) through (3), and that the Court of Appeals' decision "will cause material injustice," MCR 7.305(B)(5)(a). It's not often we see a case that checks all those boxes. We should acknowledge as much by exercising our responsibility as the

state's highest court and further considering this case;[4] I respectfully dissent from the Court's order denying reconsideration.

---

[4] Justice VIVIANO argues that denying review is appropriate because the parties to this case are not truly adversarial, as the Secretary of State agrees with the plaintiffs that the statutory requirement that ballots be received by the time the polls close on Election Day is unconstitutional under Const 1963, art 2, § 4(1). I agree with Justice VIVIANO that there are important reasons why courts generally rely on the parties to a lawsuit to present adversarial arguments, but I am not persuaded that the plaintiffs here should be penalized by the Secretary of State's acquiescence in their argument, a position over which the plaintiffs have no control. Notwithstanding the Secretary of State's position, the statute remains binding, and the plaintiffs' purported injury stands. I would not insulate that injury from appellate review for reasons beyond the plaintiffs' control.

Moreover, the Court is not without recourse for obtaining a fully aired argument on the issues presented. It could invite amici curiae to file briefs, including the Legislature—an entity that certainly has an interest in defending its own work. The Court could also appoint an attorney to act as amicus curiae to defend the judgment below—a measure the United States Supreme Court takes regularly. See, e.g., *Seila Law, LLC v Consumer Fin Protection Bureau*, ___ US ___; 140 S Ct 2183, 2195 (2020) (noting that the Court appointed Paul Clement as amicus curiae to defend the judgment below because the parties agreed on the merits of the constitutional questions). While that has not previously been our practice, we have issued similar orders when concerned with receiving robust arguments on both sides of an issue. See, e.g., *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 474 Mich 1230 (2006) (granting the request to issue an advisory opinion and directing the Attorney General to brief both sides of the issue presented); *In re House of Representatives Request for Advisory Opinion Regarding Constitutionality of 2018 PA 368 & 369*, 924 NW2d 882 (2019) (requesting the Attorney General to submit separate briefs arguing both sides of the issues presented and inviting the House of Representatives and the Senate, and any member of either chamber, to file briefs). I would use one of these strategies here to address the important issue Justice VIVIANO flags. I am sympathetic to his concerns about the difficulties that may arise in implementing these proposals. But I am not convinced that if the choice is to grapple with those difficulties or tell the plaintiffs they can't access the Court because the Secretary of State shares their view that the statute unconstitutionally disenfranchises Michigan voters, the latter is the better option. Closing the courthouse doors to a party in an important case for that reason strikes me as particularly bitter medicine.

BERNSTEIN and CAVANAGH, JJ., join the statement of McCORMACK, C.J.



I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

September 11, 2020



Clerk

a0909